Max Bloom, J.
These five separate applications for writs of habeas corpus were heard together. The questions raised by each are common to all.
Cromwell was adjudged a youthful offender arising out of a felony charge. He was sentenced to the New York City Reformatory. After a stay approximating 11 months, he was paroled. Somewhat less than two years later he was rearrested, charged and convicted. By reason thereof, he received a sentence of one year in the New York City Correctional Institution. This sentence was completed in February, 1973. The arrest gave rise to the charge of violation of parole and, upon completion of the definite sentence, he was recommitted for parole violation. Inasmuch as he had attained the age of 21 years in the interim, he was notified that he had the choice of returning to the reformatory or serving the balance of his reformatory sentence at the correctional institution, which is the city’s adult facility. He elected to remain in the correctional institution and signed an instrument waiving his right to return to the reformatory.
Jackson was convicted of attempted assault in the second degree, a class E felony. He was sentenced, as a young adult, to the New York City Reformatory. After serving 21 months, more or less, part of which was spent at Eastern Correctional Facility, he was paroled. Some seven months later he was charged with possession of a dangerous weapon and given a fixed sentence of six months in the correctional institution. This charge led to the further charge of violation of parole. Hpon completion of the fixed sentence he was recommitted on the parole violation charge. Since Jackson had attained the age of 21 years at the time of his recommitment he, too, was given the option of serving the balance of his reformatory term in *644 the adult facility or returning to the reformatory. Like Cromwell, he chose the correctional institution and signed the requisite waiver. He is now serving the balance of his reformatory sentence in the adult facility.
Vasquez followed a pattern similar to those already delineated. As an adolescent he was convicted of attempted robbery in the third degree, a class E felony. Sentence to the New Tork City Reformatory followed. After serving some eight months of his sentence he was enrolled in the Grenada Program, a work release program. A short time thereafter he absconded. Subsequently, he was rearrested for possession of stolen property. Upon conviction he was sentenced to the correctional facility for one year. With the completion of his fixed sentence he was ‘ ‘ turned around ’ ’ for violation of parole. Inasmuch as he, also, had attained the age of 21 years in the interim he, like the others, was allowed the option of completing his sentence in the adult facility or the reformatory. He chose the correctional institution and signed the necessary waiver.
Haywood and Correa followed slightly variant patterns. Although Haywood was originally charged with robbery in the third degree, a class D felony, he pleaded guilty to petit larceny, a class A misdemeanor. He was sentenced as a young adult to a reformatory term in the New York City Reformatory, part of which was spent at Rikers Island and part at Eastern Correctional Facility. While in the reformatory he was indicted for assault in the first degree, a charge upon which he is now awaiting trial. Upon attainment of the age of 21 years he was informed of his right to serve the balance of his reformatory term in the adult facility and elected so to do. Upon execution of the requisite waiver the transfer was effected.
Correa originally was sentenced to the correctional institution for a term of one year upon his conviction for attempted grand larceny in the third degree, a class A misdemeanor. While serving this sentence he was charged with sodomy. Upon conviction he was sentenced to the reformatory for a term to run concurrently with his fixed sentence. He, also, was given the choice of serving so much of his sentence as remained after he reached the age of 21 in the adult facility or in the reformatory. Initially, he selected the adult facility and signed the waiver. Thereafter, he changed his mind and notified the correctional authorities that he desired to be returned to the reformatory. His wishes were honored and he is now housed in the reformatory.
*645 I
It may not be inappropriate to note that the Bikers Island complex is an institution consisting of many facilities. Thus, it contains the Adolescent Bemand Shelter, which houses adolescents between the ages of 16 and 21 who are awaiting trial; the separate correctional facilities for men and women; and the New York City Beformatory. Prior to 1972 the reformatory was housed in the wing known as C-71. In that year a new wdng, known as C-90, was opened and the reformatory was transferred to C-90. C-71 is now used to house segregated prisoners such as homosexuals.
All adolescents, whether sentenced to fixed or reformatory terms, are housed in the reformatory. Originally, they were confined in C-71 and, more recently, in C-90. Thus, at one time or another, all of the relators were consigned to these wings. Correa remains in C-90. The other relators are now in C-76, the wing housing the New York City Correctional Institution for Men.
Three basic questions have been posed by the relators. First, they contend that no part of the Bikers Island complex meets the requirements of a reformatory. Hence, they assert that their confinement, originally in C-71 and C-90 and now, with the exception of Correa, in C-76, is not in accordance with the sentences imposed upon them. Secondly, they claim that the reformatory sentence imposed entitled them to the benefit of certain rehabilitative programs. These programs, they state, are available only to those in C-90 and are not available to those confined in C-76. Finally, they point out that confinement under a reformatory sentence deprives them of the benefit of good behavior time which those serving indeterminate or definite sentences may earn under the provisions of subdivision 4 of section 70.30 of the Penal Law.
n
Subdivision 7-b of section 46 of the Correction Law provides, among other things, that the State Commission of Correction in co-ordination with the Commissioner of Correctional Services, shall ‘‘ issue certificates of certification to reformatories established for the care, custody, treatment and training of young adults sentenced to a local reformatory sentence of imprisonment, under section 75.20 of the penal law. No such certification shall be issued unless the commission is satisfied that the reformatory has established educational and other rehabilitative programs specifically designed for young adults *646 and has adequate personnel and other resources for administering such programs.”1 Subdivision 7-b further provides that such certification may be withdrawn at any time. In such event 11 any person confined in the institution under a local reformatory sentence shall forthwith be returned to the court that committed him for re-sentencing and such court may impose any other sentence applicable.”
The C-90 wing of the Bikers Island complex was opened in January, 1972. In anticipation of the opening, the New York City Department of Correction in December, 1971 applied to the State Commission of Correction to have the reformatory certification theretofore issued to C-71 transferred from that wing to C-90. The State commission was of the opinion that such certification was not subject to transfer. Accordingly, it initiated procedures looking to certification of the new wing. It designated two persons to make an inspection of C-90. Such an inspection was made and on January 25, 1972 a report was ■submitted to the Commission of Correction. This report indicated six specific areas in which improvements were recommended. Based upon this report, and after affording opportunity both to the City Department of Correction and to counsel to the relators to be heard, the State commission on January 25, 1972, granted conditional certification to C-90 for a six-month period.
Since that time the conditional certification has been extended, initially for one-month periods and more recently, for two-month periods. The most recent extension occurred at the April meeting of the State commission when the certification was extended to June 25,1973.
In the interim, informal inspections of C-90 have been made by Commissioners Young, Cass, Stumpf and Beha. A formal inspection was made during the week of April 23, 1973, and a written report was submitted to the commission.[2]
*647 III
The relators attack the original conditional certification and the extensions thereof, contending that the system employed by the city reformatory in classifying inmates is defective, that the educational and other rehabilitative programs specifically designed for young adults are inadequate and that personnel to administer these programs is in short supply. Collaterally, they contend that the extended sentences imposed upon Haywood and Correa, who were convicted of misdemeanors, constitutes a deprivation of equal protection of the laws.
The constitutionality of the extended sentence has been the subject of attack ever since the enactment of the Parole Commission Act (L. 1915, ch. 579), the progenitor of article 7-A of the Correction Law which has been superseded by article 75 of the Penal Law. Despite these attacks our courts have held with uniformity, that the action of the Legislature, in providing for a reformatory sentence the length of which might exceed the maximum sentence which otherwise could be imposed for the crime committed, did not transcend any constitutional limitation (People ex rel. Kipnis v. McCann, 199 App. Div. 30, affd. 234 N. Y. 502; People ex rel. Coppinger v. Klein, 300 N. Y. 465; People ex rel. Brewer v. Levy, 267 N. Y. 596; People ex rel. Popino v. Warden, 31 A D 2d 788 [concurring opn. of Steuer, J.]; People ex rel. Meltsner v. Follette, 32 A D 2d 389; People v. Jiminez, 71 Misc 2d 867). Similar attacks have been leveled against the Federal Youth Corrections Act (U. S. Code, tit. 18, § 5005 et seq.), which contains parrallel provisions. These, too, have been rejected[3] (United States v. Dancis, 406 F. 2d 729 [C. A. 2d], cert. den. 394 U. S. 1019; Brisco v. United States, 368 F. 2d 214 [C. A. 3d]; Johnson v. United States, 374 F. 2d 966 [C. A. 4th]; Packnett v. United States, 435 F. 2d 693 [C. A. 5th]; Kotz v. United States, 353 F. 2d 312 [C. A. 8th]; United States v. Rehfield, 416 F. 2d 273 [C. A. 9th], cert. den. 397 U. S. 996; Rogers v. United States, 326 F. 2d 56 [C. A. 10th]; Carter v. United States, 306 F. 2d 283. [C. A. D. C.]).
The failure to embody in article 75 of the Penal Law any statement that the purpose of custody in a reformatory is to educate and rehabilitate the inmate is of no constitutional sig *648 nificance. In any event, the Correction Law (§ 46, subd. 7-b) supplies the deficiency — if deficiency it be — with regard to local reformatories.
While there may be sound basis for the argument that the extended sentence be eliminated (see ‘ ‘ Preliminary Report of the Governor’s Special Committee on Criminal Offenders ” [June, 1968], pp. 141-160 [hereinafter Governor’s Report]), it is plain that in the current state of the law, it violates no constitutional mandate.
The supplemental opinion in Sero v. Oswald (355 F. Supp. 1231 [S. D. N. Y. ]) suggests that due process may require a prior hearing on reformability before imposition of an extended sentence. The courts in this State have held to the contrary. Here, the mere imposition of an extended sentence without finding of any kind carries with it “ a necessary implication from the sentence itself that reformation is possible ” (People v. Wilson, 17 N Y 2d 40, 43). Only if there is an express or informal finding or incorrigibility is the sentence illegal (People v. Moore, 17 N Y 2d 455; People ex rel. Kern v. Silberglitt, 4 N Y 2d 59; People v. Gross, 5 N Y 2d 131).
Thus, it is plain that the imposition of extended sentences in the cases of Haywood and Correa violated no concept of due process or equal protection.
We come then to the major thrust of the first point raised by relators — that the Rikers Island reformatory does not meet standards required of reformatories.
The theory of the modern reformatory embodies the concept of “ treatment of young violators of the criminal laws. In place of punishment as the purpose for the pronouncement of criminal sentences, rehabilitation through treatment or [1] corrective and preventive guidance ’ is the end sought.” (Rogers v. United States, supra, p. 57). Whether the sense of compassion inherent in the concept of the reformatory has had the social use predicted for it is now the subject of searching re-examination.[4] No meaningful statistics are available. The *649 value of treatment as a vehicle for rehabilitation is probed in the Governor’s Report (pp. 281-323). While recommendations are made, based upon given postulates, the report frankly acknowledges that the assumptions made rest only on the base that they have been the predicate for the correctional system in the past. They cannot be supported by studies. The “ President’s Commission on Law Enforcement and Administration of Justice ” (1967), (hereinafter President’s Commission), after indicating that “ [l]ife in many institutions is at best barren . and futile, at worst unspeakably brutal and degrading ”, guardedly suggests that [1] ‘ there are hopeful signs that far-reaching changes can be made in present conditions. The Commission found, in the course of its work, a number of imaginative and dedicated people at work in corrections. It found a few systems where their impact, and enlightened judicial and correctional policies, had already made a marked difference; a few experimental programs whose results in terms of reduced recidivism were dramatic ” (p. 159).[5]
Relators ’ attack is, however, somewhat more limited in scope. There is no frontal joinder of issue with the reformatory system, as such. They bottom their assault upon the claim that the classification program which obtains in the city reformatory is unworthy of the name; that without such a program there can be no appropriate diagnosis of the personality deficiencies of inmates; and that, without proper diagnosis, treatment or *650 rehabilitation is conducted on a “ hit or miss ” basis. By consequence, argue relators, the action of the Commission of Correction in provisionally certifying the reformatory was ultra vires.
To this the concise answer is that the issue tendered is not in ¡such a position as to permit disposition on the merits (cf. People ex rel. Cavalluzzo v. Warden, 39 A D 2d 897). The barest elements of due process mandate notice and an opportunity to be heard[6] (International Shoe Co. v. Washington, 326 U. S. 310). “ Prior cases establish, first, that due process
requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard ” (Boddie v. Connecticut, 401 U. S. 371, 377). “ An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality, is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present - their objections ” (Mullane v. Central Hanover Trust Co., 339 U. S. 306, 314). Where the attack is against State action, a State officer must be made a party and appropriate notice given (Sero v. Oswald, 351 F. Supp. 522 [S. D. N. Y.], supra, Ince v. Rockefeller, 290 F. Supp. 878 [S. D. N. Y.]). Relators’ failure to comply with these primary requirements, i.e., to name some State official as a party and to give notice to the office of the Attorney-General (CPLR 307), deprived the Commission of Correction — the body whose determinations is under attack — of the opportunity to come forward and submit evidence to justify its grant of conditional certification.
The purpose of the writ of habeas corpus is to compel compliance with the law. To permit the accomplishment of this laudable end by ignoring the requisites of due process is impermissible.
Correctional study lies within the ambit of social scientists. The constitutional separation of powers delegates to the Legislature the duty of fixing correctional policy by selecting between the competing theories advocated by criminologists. This the Legislature has done. It has delegated administration of that policy to the Commission of Correction in co-ordination *651 with the Commissioner of Correctional Services. If, together, they have violated the policy fixed hy the Legislature in granting conditional certification to the city reformatory, a proper regard for orderly procedure suggests that review of their determination should be upon notice to them, in the manner prescribed by law. That is not to say that the writ may not be used to review alleged illegal administrative detention (cf. People ex rel. Menechino v. Warden, 27 N Y 2d 376). It is to say only that, in this proceeding, there has been a failure to include as party to this proceeding the body whose ruling furnishes the basis for that detention.

TV

Additionally, relators contend that they were sentenced to the city reformatory for the purpose of rehabilitation. All, with the exception of Correa, assert that these programs are available only to reformatory inmates, and, since their transfer to the correctional institution, are not available to them.
The purpose of commitment to a reformatory is to reform and rehabilitate. For this purpose the Legislature has mandated that treatment is to be the guiding principle (Correction Law, § 70; People ex rel. Meltsner v. Follette, 32 A D 2d 389, supra; People ex rel. Ceschini v. Warden, 30 A D 2d 649; U. S. Code, tit. 18, § 5005 et seq.; Rogers v. United States, 326 F. 2d 56 [C. A. 10th], supra). Although the effectiveness of this formulation of policy, which found practical implementation with the establishment of Elmira Reformatory in 1876 [7], is now subject to intensive review, the Governor’s Report recommends continuation of the system even though it acknowledges that “ there is an absence of demonstrable knowledge as to treatment effectiveness” (p. 55; see, also p. 51). The President’s Commission, while demonstrating muted enthusiasm for the treatment theory, is constrained to admit that “ many of the new ideas, while supported by logic and some experience, are yet to be scientifically evaluated.” (p. 159). Other schools of thought hold that treatment has little or no effect upon rehabilitation.[8] These potentially competing schools of sociological thought are carefully equivocal in their articulation of conclusions. Indeed, it is their equivocation which mutes direct confrontation. It scarcely behooves the courts to consecrate as truth sociological policy which the sociological experts treat with such ambivalence.
*652 Notwithstanding the absence of proof of the effectiveness of a particular theory of corrections, the needs of society must be served. To meet that need, the Legislature has adopted a policy. This was within the ambit of the Legislature’s constitutional prerogative. In the absence of a clear demonstration that such policy violates the Constitution, and no such showing has been here made, the courts are bound thereby.
Since relators were sentenced to an institution which, under the mandate of the Legislature, is required to make available Certain rehabilitative procedures, they are entitled to receive such treatment. Failure to grant such treatment to them infringes the constitutional requirements of due process (People ex rel. Saia v. Martin, 289 N. Y. 471). Where there is claim that a person sentenced to a rehabilitative institution is not being accorded treatment, the court must inquire into the validity of that contention. While the court may not fix the nature of the treatment to be accorded, there must be assurance that there be compliance wdth the command of the sentence. If the hearing discloses that the sentence is merely a mask for extended incarceration, the relators must be transferred to an institution where treatment is given, or they must be released. (People ex rel. Meltsner v. Follette, supra; People ex rel. Ceschini v. Warden, supra; People v. Jiminez, 71 Misc 2d 867, supra.)
Here, the evidence disclosed the existence of numerous programs at the city reformatory. These included educational opportunities both at the Public School No. 189 and John Jay Junior College programs, vocational programs, a work release program, the VISTA program which gives educational and vocational counseling to those for whom release is impending, an Addiction Services Agency program, and others. It may he quite true that these programs do not stand on the same plateau as do the programs obtaining in State reformatories. Nevertheless, there is little doubt that there has been substantial improvement in all phases of the operation of the city reformatory since the report of January 25, 1972.[9]
Inasmuch as the city reformatory affords treatment appropriate to a reformatory, it does not lie within the judicial ambit to evaluate its successes or failures.
It may not be inappropriate to note that governmental action rarely attains perfection. It does not follow that, because one *653 is able to find fault with the treatment made available to inmates of the city reformatory, that treatment does not meet constitutional standards. ‘[1] The problems of government are practical ones and may justify, if they do not require, rough accommodations— illogical, it may be, and unscientific” (Metropolis Theatre Co. v. Chicago, 228 U. S. 61, 69-70; McGinnis v. Royster, 410 U. S. 263).
With respect to the four relators now housed in C-76, the record is clear that substantially the same programs as those available to Correa are available to them. While they may not attend Public School No. 189, they may, in substitution therefor, attend Correctional High School. In other respects the treatment is similar. Accordingly, their right to treatment has not been affected by transfer from C-91 to C-76.
There remains for determination the power of the City Department of Correction to transfer these four relators from the city reformatory to the city correctional facility.
Section 23 of the Correction Law authorizes the State Commissioner of Correctional Services to transfer inmates from one correctional facility to another. Neither State law nor the New York City Administrative Code gives similar power to the City Commissioner of Correction. Accordingly, the sole authority for the transfers here involved must be found in the waivers signed by relators other than Correa. While this is sufficient, to sustain the transfers, the act of waiver is not irrevocable. Hence, should any of the four relators notify the appropriate authority of a revocation of his waiver, the Commissioner is directed to retransfer him to the reformatory.
Y
Relators ’ final argument asserts that they are the victims of unlawful discrimination because they alone, as recipients of reformatory sentences, are not entitled to “ good behavior time ’ ’.
Good behavior time is the time allowance granted against the maximum term of a sentence “for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program ”[10] *654 (Correction Law, § 803, subd. 1; § 804, snbd. 1). For persons ■serving indeterminate sentences, the allowance shall not exceed in the aggregate one third of the maximum term imposed (Penal Law, § 70.30, subd. 4, par. [a] j Correction Law, § 803, subd. 1). For those serving definite sentences, one sixth of the aggregate sentence may be allowed as a discretionary reduction in sentence (Penal Law, § 70.30, subd. 4, par. [b]; Correction Law, § 803, subd. 1).
The Penal Law defines an indeterminate sentence (§ 70.00, subds. 1 and 2) as one in which the court shall impose a term, the maximum of which shall not exceed a specified period. Under paragraph (b) of subdivision 3 a minimum sentence may be imposed which shall not exceed one third of the maximum and shall be not less than one year. Where no minimum is fixed, it shall be set by the Parole Board (Penal Law, § 70.00, subd. 3, par. [c]). A definite sentence is defined as. one in which £ £ the term shall be fixed by the court ”. (Penal Law, § 70.15.)
A reformatory sentence fits into neither of these categories. It is ££ a sentence to imprisonment for a period of unspecified duration ’ ’ the maximum or minimum length of which shall not be fixed by the court (Penal Law, § 75.00, subd. 2). By statute, a local reformatory sentence commences with receipt qf the inmate into the reformatory and terminates either upon discharge from parole or the expiration of three years (Penal Law, § 75.20, subd. 4).
A person serving an indeterminate or reformatory sentence may be paroled, in the absence of the imposition of a minimum sentence by the court, at any time following service of one year of his sentence (Correction Law, § 212, subd. 1). Where the sentence is an indeterminate one carrying no minimum, the Division of Parole shall fix the minimum period of imprisonment not earlier than nine months nor later than one year after the imposition of sentence (Correction Law, § 212, subd. 2). Where the sentence is a reformatory sentence the mínimum parole date shall be fixed within six months (Correction Law, § 212, subd.
4). However, the person serving an indeterminate sentence ■shall be entitled to conditional release, as a matter of law, "when the total good behavior time allowed to him, pursuant to the provisions of the correction law, is equal to the unserved portion of his maximum * * * term ” (Penal Law, § 70.40, subd. 1, par [b]). No such reduction or institutional time is allowed to a reformatory inmate.
It is this distinction which relators assert is invidious, depriving them of equal protection of the law within the meaning of the Fourteenth Amendment.
*655 It is undisputed that those sentenced to reformatory terms are the only persons who, under the statute, are not entitled to good behavior time. Even one convicted of a felony who, prior or subsequent to sentence, is committed to the custody of the Commissioner of Mental Hygiene is given the equivalent of good time. Under subdivisions 3 and 5 of section 730.50 of the CPU, the sum of all orders of retention for a prisoner so committed “ must'not exceed two-thirds of the authorized maximum term of imprisonment for * * * the highest class
felony of which he was convicted.”
In all other respects relators stand on the same plane as those committed to the correctional institution. Although relators are accorded treatment appropriate to reformatory inmates, the testimony makes clear that the programs obtaining in C-90 and C-76 are substantially identical. Indeed, most are participated in jointly by both sets of prisoners. Where a program available at one institution is not available at the other, a counterpart is furnished. Although the law mandates that the minimum parole date be fixed earlier for those sentenced to reformatories, the standard applied in fixing those dates is the same. In short, the treatment accorded the reformatory inmate and the prisoner sentenced to an indefinite term is, in substance, identical.
It may well be that the distinction between the two had “ some rational basis ” (McGinnis v. Royster, supra, p. 270) at a time when the concept of treatment was limited to reformatories only and when segregation of the young from the hardened recidivist was deemed essential to rehabilitation. However, the 1970 amendments to the Correction Law expanded the theory of treatment to include all prisoners beneath its umbrella; and, it is clear, from the record in this case as well as from other reported cases (People ex rel. Meltsner v. Follette, 32 A D 2d 389, supra; People v. Jiminez, 71 Misc 2d 867, supra) that segregation of reformatory inmates is no longer the rule. Hence, the “ rational basis ” which originally justified the disparity in treatment has been swept aside by the forward movement of the State’s correctional policy.
In Bolling v. Manson (345 F. Supp. 48) a situation analogous to that here presented was at issue. There, under the Connecticut statutory plan, persons sentenced to a reformatory were denied good behavior time while those sentenced to definite terms, as defined by Connecticut law, i.e., a sentence carrying with.it a minimum as well as a maximum term, and transferred to the same institutions, were permitted to accrue it. Rehabilitative treatment was, apparently, minimal and was available equally *656 to reformatory and definite sentence inmates. The only distinction between the two was the State policy to parole reformatory inmates as early as possible. The court (p. 51), invoking the “ compelling state interest” doctrine, held that the favorable use of the discretionary power of parole did not compensate for treating one group differently from the other, and held the statutory scheme unconstitutional as applied to reformatory inmates.
People ex rel. Batista v. Zelker (39 A D 2d 343), posed the same question. However, it did not meet the problem directly. There, the relator had pleaded guilty to attempted manslaughter in the second degree. Inasmuch as the crime was committed before September 1, 1967, the maximum sentence for the crime under the then existing Penal Law was seven and one-half years. However, in lieu of that term of imprisonment the relator was given a reformatory sentence which, at that time, could not exceed five years. Upon his transfer from Elmira Reformatory to Green Haven Prison he requested resentence so that he might accumulate good time. The court computed his release date on the basis of the reformatory sentence and on the basis of his earliest release date had he been given a seven and a half-year jail sentence. Concluding that in either event the release date would be the same, it affirmed the denial of the writ.
The statutes (Correction Law §§ 803, 804) make it plain that the sole purpose in the grant of good behavior time on the maximum term is the prompt, willing and efficient performance of tasks assigned. It is a housekeeping measure to effect co-operation of the inmates in the- administration of the institution. It has no rehabilitative function and, therefore, is different in purpose from the extended sentence. To the extent - that relators have earned this benefit by “ good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program ”, they are entitled to credit therefor. [11]
*657 There remains a problem which must be disposed of. Inasmuch as it has hitherto been assumed that relators .are not entitled to an allowance of good behavior time, no proceedings have been brought against any of them to effect a forfeiture of that allowance. It may well be that examination of their institutional records will disclose infractions and violations which warrant forfeiture of all or some part of the good behavior time allowance to which I now hold them to be entitled. Accordingly, the New York City Commissioner of Correction is directed to forthwith examine into the institutional records of relators for the purpose of determining whether those records disclose warrant for administrative proceedings looking to a forfeiture of good behavior time. Any such proceedings shall be commenced within 20 days after service upon the Commissioner of copies of the orders to be entered herein together with a copy of this memorandum.

. Subdivision 7-b of section 46 of the Correction Law and section 75.20 of the Penal Law, which authorizes the alternative local reformatory sentence for young adults, were repealed, eff. Jan. 1, 1974 by chapter 354 of the Laws of 1971.

. The members of the State commission who testified wer'e not present at the April meeting. Hence, they were unable to state whether this report was before the commission when it voted the latest extension of the provisional certification. Since, however, the report is dated April 30, 1973, it is plain that the commission had not received it at the time the April meeting was held. Nor is there any indication that the content of the report was conveyed to the commission orally prior to the April meeting.

. In Sero v. Oswald (351 F. Supp. 522 [S. D. N. Y.]) Judge Lasker, in an exhaustive opinion, concluded that an attack upon the constitutionality of the extended sentence authorized under article 75 of the Penal Law was so palpably frivolous that it did not merit the convocation of a three-judge court to pass on the issue. However, in a supplementary opinion (355 F. Supp. 1231), he amended his determination to include this issue among those to be decided by a three-Judge court.

. Professor Martinson testified that nothing which happens to a person during incarceration, whether in a prison or reformatory, affects recidivism. Subsequently, in his testimony he tempered this opinion somewhat. Commissioner Oswald voiced the opinion that treatment of the young offender might prove helpful. Dr. Mann indicated that the combining of punishment and rehabilitation would, in most instances be ineffective. He suggested that the reformatory' sentence be divided into two distinct parts; the first part, penal in nature and the second part, rehabilitative. He went on to assert that each part of the sentence should be served at a different institution so that young, impressionable inmates could easily distinguish between the two.

. These reports prompted substantial reform of the New York State correctional system (L. 1970, ch. 476; L. 1970, ch. 477; L. 1970, ch. 478; L. 1970, ch. 479; L. 1971, ch. 492; L. 1971, ch. 354). Differing types of facilities have been and áre being created. Stress is now laid on treatment of all inmates rather than just those who are sentenced to reformatories. In sum, the State correctional system now appears to be embarking on a series of experimental programs to determine which, if any, kinds of treatment can promote rehabilitation and thus limit recidivism. Whether in light of these changes in the law this is justification for continuance of the reformatory creates a serious policy question which must be confronted by the Legislature. The thinking behind the innovations now embodied in the law is succinctly expressed in the “Multi-Year Master Plan of the Department of Correction Services” [Apr. 1, 1973] (p. I-11) : “ 3. The present inability of social science and research tó provide a solid frame of reference for considering alternative courses of action and estimating their consequences. Until such time as interventional techniques for specifically delineated offender types are perfected, programmatic formulations must rely on a strategy of search. We can no longer afford to invest massive sums of money and manpower on system-wide programs based on theories and practices whose expectations are largely optimistic, and where results are substantially unproven. Diversification provides the range of options and the flexibility of approach needed for such strategy of search.” (Italics in original.)

. Although three State officials were called to testify, no State representative was named as a party respondent and service of papers was not made upon the Attorney-General. Whether any State representative was ever made aware of the scope of the attack upon the provisional certification of the city reformatory by the Commission of Correction is not indicated,

. Governor’s Report, p. 149.

. Seen.4.

. Commissioner Oswald, who compared the reports of January 25, 1972 and April 30, 1973, testified that the latter report indicated marked gains. While conceding that the classification program was operating at a lower level than those existent in State institutions he insisted that it was manifestly better than it has been on January 25,1972,

. The issue in this ease differs from that in McGinnis v. Royster (410 U. S. 263). That case involved the allowance of good behavior time against a minimum sentence. Royster held that the provision for good behavior time against the minimum sentence (now repealed by L. 1970, ch. 476), had a rehabilitative purpose. In that respect it is like an extended sentence. However, the allowance of good time against maximum is a housekeeping provision the purpose of which is to provide incentive to the prisoner to aid in the smooth flow of institutional life.

. It is a fair inference from the testimony of Commissioner Caldwell of the Division of Parole that this result was achieved in substance by accelerating and deferring parole. Where a reformatory inmate proved to be intractable this was generally noted on his institutional record with a recommendation to the Division of Parole that his parole be deferred. Usually, the division followed this recommendation. However, while the inmate would be deprived of the equivalent of good behavior time in this fashion, it would be without benefit of the administrative hearing to which, otherwise, he would be entitled. (Correction Law, § 803, subd. 3; Sostre v. McGinnis, 442 F. 2d, 178, 194-199; People ex rel. Stark v. Deegan, 56 Misc 2d 567; Kritsky v. McGinnis, 313 F. Supp. 1247 [N. D. N. Y.] ; cf. Rodriguez v. McGinnis, 451 F. 2d 730 [C. A. 2d].)