**UNITED STATES ex rel. Lois SERO et al.,
Petitioners,**

v.

**Peter PREISER, Commissioner of the
New York Department of Correction-
al Services, et al., Respondents.**

No. 72 Civ. 778.

United States District Court,
S. D. New York.

March 6, 1974.

See also D.C., 372 F.Supp. 660.

Herman Schwartz, Edward I. Koren, New York Civil Liberties Union, National Prison Project—American Civil Liberties Union, Amherst, N. Y., Elizabeth B. DuBois (Legal Action Center of the City of New York, Inc.) New York City, for petitioners.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for respondents; Michael Colodner, Asst. Atty. Gen., of counsel.

## MEMORANDUM

LASKER, District Judge.

The issues before us in this latest of a number of opinions filed in this storied case are whether plaintiffs' allegations that the New York procedure for imposing "extended" reformatory sentences upon them is unconstitutional and that they are constitutionally entitled to time off for good behavior state claims upon which relief can be granted. We wrote earlier on these subjects, when plaintiffs sought injunctive relief, and the issue before us was whether these propositions presented substantial constitutional questions such as to require the convening of a three judge court. We held that they did. 351 F.Supp. 522 (D.C. 1972) and 355 F.Supp. 1231 (D.C.1973). Since that time plaintiffs have withdrawn their request for injunctive relief, and we are now asked to rule as a single judge on defendants' motion to dismiss the two claims described above.

### I.

Plaintiffs have been convicted of misdemeanors which carry a sentence of a year or less in the case of an adult. However, under the provisions of §§ 75.-00 and 75.10 of the New York Penal Law, they have been sentenced to indefinite reformatory terms of up to four years. The statutory provisions for such an "extended sentence" contain no standards as to when they should be applied, although they have been construed by the courts of New York to be applicable only when the defendant is "reformable" (*see* People ex rel. Meltsner v. Follette, 32 A.D.2d 389, 302 N.Y.S.2d 624 (2d Dept. 1969); *cf.* People v. Bell, 38 A.D.2d 778, 328 N.Y.S.2d 153 (4th Dept. 1972)). Plaintiffs contend that they have been deprived of due process, since they were not accorded dispositional hearings to determine whether they were indeed reformable. They further argue that they are entitled to such a hearing under the equal protection analysis of Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), applied in Davy v. Sullivan, 354 F.Supp. 1320 (M.D.Ala.1973) (three judge court).

Defendants deny the applicability of *Humphrey* and *Davy* (or Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), a forerunner of *Humphrey*). As to *Specht*, they argue that the Court ruled that a separate hearing is required only when a conviction of crime triggers the need for new findings as to whether a defendant is in fact a sexual deviate. As to *Humphrey*, defendants contend that its holding is limited to the proposition that new findings by a jury outside the traditional sentencing process may be required on equal protection grounds where—but only where—similar findings are required by state law for civil commitments.

We agree with defendants that the *Humphrey-Specht* axis of decision

does not point to the constitutional requirement of a "dispositional hearing" for imposition of an extended sentence in the case of a young offender. We accept defendants' rationale that it is not the correlation between the actual length of sentence and the maximum possible sentence for the crime that is critical as to whether a dispositional hearing is required, but rather the nature of the determination to be made in imposing sentence. As we read *Humphrey-Specht,* a dispositional hearing may be constitutionally required as a matter of due process (*Specht*) or equal protection (*Humphrey*) where it is necessary to make a separate decision of fact outside the traditional sentencing process—*e. g.,* as in those cases, whether the defendant is in fact a sexual deviate,—but not, as here, to determine whether a defendant shows rehabilitative potential, a matter which falls within the parameters of traditional sentencing.

Nevertheless, for reasons which we will elaborate, we conclude that the contention that the New York statutory framework for imposing on youthful offenders reformatory sentences which may be substantially longer than the sentence which may be imposed on adults for the same offense is unconstitutional, as that framework has been construed by the New York courts, states a claim upon which relief can be granted.

## II.

■ Defendants argue that the New York statutory scheme is "identical" to the Federal Youth Correction Act (18 U.S.C. § 5010*ff*) and we have earlier held that the two acts are sufficiently similar so that federal decisions constru-

ing the latter may appropriately be applied in determining the constitutionality of the former (351 F.Supp. at 526–527).

■ The constitutional underpinning for the imposition of a longer sentence on a youthful offender than an adult for the same crime has been stated in plain words by Chief Justice (then Judge) Burger in Carter v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283, 285 (1962) as follows:

"[C]ommitment under the Youth Correction Act may be longer than one year in cases of misdemeanors, essentially because such confinement cannot be equated with incarceration in an ordinary prison. . . . But the basic theory of that Act is rehabilitative and in a sense this rehabilitation may be regarded as comprising the *quid pro quo* for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison. The reasoning of the Cunningham court is relevant in this connection. The court there noted that the Youth Corrections Act 'provides for and affords youthful offenders, in the discretion of the judge, not heavier penalties and punishment than are imposed upon adult offenders, but the opportunity to escape from the physical and psychological shocks and traumas attendant upon serving an ordinary penal sentence while obtaining the benefits of corrective treatment, looking to rehabilitation and social redemption and restoration.' 256 F.2d at 472."

The clear instruction of the *Carter* holding, which is typical of a plethora of federal decisions upholding the constitutionality of the federal act,[1] is that ab-

1. *See, e. g.,* Caldwell v. United States, 435 F.2d 1079 (10th Cir. 1970) ; Abernathy v. United States, 418 F.2d 288 (5th Cir. 1969) ; United States v. Rehfield, 416 F.2d 273 (9th Cir. 1969), cert. denied, 397 U.S. 996, 90 S. Ct. 1137, 25 L.Ed.2d 405, reh. denied, 397 U.S. 1081, 90 S.Ct. 1526, 25 L.Ed.2d 820 (1970) ; United States v. Dancis, 406 F.2d 729 (2d Cir.), cert. denied, 394 U.S. 1019, 89

S.Ct. 1640, 23 L.Ed.2d 44 (1969) ; Johnson v. United States, 374 F.2d 966 (4th Cir. 1967) ; Brisco v. United States, 368 F.2d 214 (3d Cir. 1966) ; Kotz v. United States, 353 F.2d 312 (8th Cir. 1965) ; Rogers v. United States, 326 F.2d 56 (10th Cir. 1963) ; Standley v. United States, 318 F.2d 700 (9th Cir. 1963) ; Tatum v. United States, 114 U. S.App.D.C. 49, 310 F.2d 854 (1962) ; Carter

sent the *quid pro quo* of rehabilitation an extended sentence is not constitutionally justified.

We must, therefore, examine the New York statutory framework, as construed by the New York courts, to determine whether, as its provisions operate, defendants who are sentenced to extended reformatory sentence under its provisions are assured of the opportunity of rehabilitation. We conclude that they are not.

To be sure the New York scheme includes many virtues. For example, the New York Criminal Procedure Law (CPL) [2] sets out a detailed, normal, modern presentence and sentence procedure. Before a reformatory sentence can be imposed, it requires a pre-sentence investigation of "the circumstances attending the commission of the offense, the defendant's history of delinquency or criminality, and the defendant's social history, employment history, family situation, economic status, education, and personal habits," as well as "any other matter which the agency conducting the investigation deems relevant to the question of sentence." (CPL § 390.30(1).) Furthermore, the pre-sentence report, presented to the sentencing judge, must contain not only an analysis of as much of the investigated material as the agency deems relevant to sentence (CPL § 390.30(3)), but also "must include any matter the court directs to be included" (CPL § 390.30(1)). Even if the worst is assumed, that is, that a hard-pressed judge faced with a heavy calendar of sentences may not often ask, or know enough about the information available to ask, that facts not considered relevant by the agency be included, the statutory requirements for investigation and report provide a framework which assures that the sentencing judge will have adequate information upon which to determine whether a reformatory sentence is appropriate.

This conclusion is strengthened by the fact that the CPL, provides a statutory right to the defendant to file his own presentence memorandum "setting forth any information he may deem pertinent to the question of sentence," together with written statements by others in support of facts alleged in the memorandum. (CPL § 390.40.)

Furthermore, in the case of a person convicted when less than 21 years old (and all of the plaintiff class are below that age), the court may order that the defendant "undergo a thorough physical or mental examination in a designated facility and may further order that the defendant remain in such facility for such purpose for a period not exceeding thirty days." (CPL § 390.30(2).)

The present statute also authorizes the court, in its discretion, to hold a pre-sentence conference to "resolve any discrepancies between the pre-sentence report, or other information the court has received, and the defendant's pre-sentence memorandum" or to "assist the court in its consideration of any matter relevant to the sentence to be pronounced." (CPL § 400.10(1).) At such a conference, the court may direct the attendance of any person (CPL § 400.-10(2)) and may conduct "a summary hearing . . . on any matter relevant to sentence and may take testimony under oath" (CPL § 400.10(3)). It is true that the last mentioned provisions do not apply to persons (including the named plaintiffs and others in the class) who were sentenced before the CPL became effective, September 1, 1971. Nevertheless, while we do not agree with de-

v. United States, 113 U.S.App.D.C. 123, 306 F.2d 283 (1962); Cunningham v. United States, 256 F.2d 467 (5th.Cir. 1958).

2. The CPL became effective September 1, 1971. The named plaintiffs—and presumably other members of the plaintiff class— were sentenced when its predecessor, the Code of Criminal Procedure, was in effect. The Practice Commentary to CPL § 390.30 (relating to pre-sentence reports) states that "this section is substantially a restatement of former Code [of Criminal Procedure] Section 931 (Subd. 1)," and we agree that it is.

fendants' suggestion that we should assume that such procedures were used prior to passage of the CPL merely because "nothing in the prior practice prohibited them," neither do we find that absence of such desirable provisions from the earlier law is fatal to the constitutionality of extended sentences imposed under it.

It is also true that the New York courts have held, as to §§ 2185 and 2195 of the old Penal Law, the predecessors of §§ 75.00 and 75.10 under which plaintiffs have been sentenced, that no extended sentence may be imposed except upon a showing that the defendant has the "ability to benefit from . . . rehabilitation facilities and treatment" (People ex rel. Meltsner v. Follette, supra, 32 A.D.2d at 390, 302 N.Y.S.2d at 626).

Nevertheless New York's scheme is fatally flawed by the holdings and implications of other authoritative decisions determining the conditions under which extended sentences may be imposed. We have indicated above that the sole constitutional justification for imposing a longer sentence on a youthful offender than an adult for the same crime is the assurance of the "*quid pro quo*" of rehabilitative treatment; but the Court of Appeals of New York, as we read its holdings on the subject, has quite clearly stated that no such *quid pro quo* is required by New York law. In People v. Wilson, 17 N.Y.2d 40, 268 N.Y.S.2d 6, 215 N.E.2d 333 (1965), the court specifically approved extended sentences under Article 7–A of the Correction Law (allowing commitment to local or city reformatories), although candidly acknowledging that "[a]s we wrote in People ex rel. Kern v. Silberglitt, we know 'that this kind of sentence, authorized by the Legislature for one purpose [i. e. rehabilitation], is being used for quite a different one" (*id.* at 43, 268 N.Y.S.2d at 8, 215 N.E.2d at 334) and that "there is nothing illegal about any of these sen-

tences, however ill advised some or all might seem to be, and even though article 7–A sentences may have been imposed not for reformation purposes but to keep the defendants in custody for a longer time" (*id.* at 45, 268 N.Y.S.2d at 10, 215 N.E.2d at 335).

█ *Silberglitt* and *Wilson* are perfectly clear in holding that the imposition of an extended sentence on young persons is permissible even if imposed for punishment rather than rehabilitation. Such a rationale flies in the face of the constitutional justification for extended sentences articulated by Chief Justice Burger in Carter v. United States, *supra,* and removes the underpinning on which the constitutional edifice of the scheme is founded. Accordingly, we find that plaintiffs' allegation that the New York scheme deprives them of due process states a claim upon which relief can be granted and defendants' motion to dismiss this cause of action is denied.

### III.

Although in the present posture of the case we are not called upon to suggest a procedure which would render the New York statutory framework constitutional, we believe it would be constructive to do so.

█ Since the fundamental requirement is to prohibit the use of an extended sentence for punishment rather than rehabilitation, this indispensible factor can best be assured by following the procedure recently imposed on federal trial courts in this circuit by the decision of the Court of Appeals *en banc* in United States v. Kaylor, 491 F.2d 1133 (2 Cir. 1974). In *Kaylor* the court ruled that in sentencing a defendant eligible for treatment under the Federal Youth Corrections Act, the trial court must make explicit findings whether the defendant will benefit from such treatment and must provide a statement of reasons underlying its ultimate finding.[3]

---

3. The *Kaylor* determination is contrary to rulings of New York courts on the subject.

While the New York courts have ruled that an extended sentence may not be imposed in

It is true that *Kaylor* is founded on a construction of the Federal Youth Corrections Act rather than the Constitution, but there are a number of reasons for applying its rule to proceedings under the New York statute as well. First, as we stated earlier, New York's Attorney General, representing the defendants, declares that the New York and federal schemes are "identical" and we accept his statement as an authoritative view of how the New York statute should be compared to the federal. Second, the purposes of both statutes are clearly the same. Even though the New York law does not indicate in *haec verba*, as the federal statute as construed does, a *preference* for treatment as opposed to an ordinary sentence, the mutual aims of both laws are a) to provide optional methods for the sentencing court and b) to assure the use of those options in such a way that the defendant will receive the most appropriate disposition for his own benefit and that of society.

It follows that the sentencing court under either statute must make an intelligent and deliberate decision as to which sentencing course to pursue. The making of such a decision under the New York statute—just as much as under the Federal law—requires specific findings and a statement of reasons for those findings. Such specificity will guard effectively against the possibility that an extended sentence may be imposed for punishment rather than rehabilitation. As the *Kaylor* court noted, this means that "while no prescribed formula or litany is called for" the sentencing judge "should mention not only his own awareness that the Act is applicable to the case; he should indicate

that he has been informed of the pertinent facts relating to the individual defendant, either by way of evidence at the trial, a pre-sentence report or otherwise; and he should indicate that he has given consideration and related the facts of the individual case to the applicable law. * * * [T]he mix is ultimately to be based upon an examination of the individual's case rather than a 'fixed sentencing policy based on the category of crime,' for example, or some other uniform or mechanical sentencing policy." *Kaylor*, 491 F.2d at 1139.

Such a procedure will not only assure that New York's Act is administered in accordance with its purpose, and avoid constitutional questions, but also that the court to which a reformatory sentence may be appealed has available to it the information necessary to determine the appropriateness of the sentence. As the *Kaylor* court noted: "There is no rational way in which [a reviewing court] can determine whether such a finding is adequately supported in the absence of a statement of the reasons underlying it as an ultimate finding." 491 F.2d at 1139–1140.

The proposition could not be better put than in the views of the ABA Project on Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences at 2–3 (Approved Draft 1968), which the *Kaylor* court quoted with approval (491 F.2d at 1140):

> "It is hardly commanding of public respect for our system on the one hand to increase the alternatives of the sentencing judge so that he can shape his sentence to fit each case, and on the other hand to take the position that he need not explain why he selects a particular sentence."

the absence of a showing of "the ability [of the defendant] to benefit from . . . rehabilitation facilities and treatment", (People ex rel. Meltsner v. Follette, *supra,* 32 A.D.2d at 390, 302 N.Y.S.2d at 626), nevertheless the Court of Appeals of New York has "decided that the fact that there was *no evidence* of an affirmative finding that defendant was incapable of reformation did not invalidate the original sentence, since there

was no requirement that the sentencing court make an express finding on reformability before imposing sentence, and the imposition of the sentence itself under the circumstances implied a finding." People v. Silberglitt, 4 N.Y.2d 59, 65, 172 N.Y.S.2d 145, 150, 149 N.E.2d 76, 80 (1958) (emphasis in original). *See also* People v. Bell, 38 A.D.2d 778, 328 N.Y.S.2d 153 (4th Dept. 1972).

Without applying the requirements of *Kaylor*, there is serious risk that, in spite of the merit of the New York statutory framework, injustice may be done to the young person whom it is intended to assist. As has been noted elsewhere,

"The difficulty with the rehabilitative ideal is that it assumes an 'internal pernicious force' in the individual as the genesis of the criminal act, and ignores equally, perhaps more, important environmental forces. Not all offenders are sick; many are exceedingly normal given the conditions of their existence. These basic insights, however, are lost in the juvenile sentencing schemes that authorize wholesale confinement of youthful offenders, and allow courts to practice confinement as much on the basis of the community's desire for protection as the individual's need for treatment. This ambiguity in the conduct classification, coupled with the inevitable unevenness of judicial performance in assessing need for treatment, means that many children who are not within the intended class can be committed for an indeterminate period simply because they engage in certain conduct." E. Chase, "Schemes & Visions: A Suggested Revision of Juvenile Sentencing," 51 Tex.L.Rev. 673, 687–88 (1973) (footnote omitted).

Such a result would not carry out the intentions of the legislature nor meet constitutional standards.

It is well to recall the Supreme Court's observations in In re Gault, 387 U.S. 1, 18–20, 87 S.Ct. 1428, 1438, 18 L. Ed.2d 527 (1967):

"Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: 'The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts. . . .' The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treat-

ment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness. The Chairman of the Pennsylvania Council of Juvenile Court Judges has recently observed: 'Unfortunately, loose procedures, high-handed methods and crowded court calendars, either singly or in combination, all too often, have resulted in depriving some juveniles of fundamental rights that have resulted in a denial of due process.'

Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy." (Footnotes omitted.)

Courts ought not shut their eyes to the fact that "[a] recent stream of commentary has recognized that the indeterminate sentence, with its uncertainty and potential for discrimination, is more burdensome, ironically, than the definite sentence it is designed to replace." 51 Tex.L.Rev. at 705. To guard against the irony of the indeterminate sentence —intended to be beneficent—becoming more burdensome than the sentence it was intended to supplant, the Constitution requires procedures which will prevent the imposition of an extended sentence for the purpose of punishment rather than rehabilitation.

### IV.

Sections 803 and 804 of the New York Correction Law authorize conditional release for persons sentenced both to indeterminate and definite terms. Under the statutory provisions, the plaintiff class—that is, those subject to reformatory sentences—are not eligibile for the benefit of good behavior allowance and consequent conditional discharge. Plaintiffs allege that §§ 803 and 804 are un-

constitutional on their face and as applied under the due process and equal protection clauses, "because they deny persons sentenced thereunder the opportunity to earn good time and to be released on conditional release, without any valid penological or other consideration, even though such persons are treated the same and punished to the same extent as other prison inmates who are granted good time and the opportunity to be released on conditional release. They deny persons aged 16 to 21 equal protection of the law, by treating such persons worse than they treat persons over 21 who commit the same or lesser offenses, for no compelling or even rational basis." (Amended Petition of November 9, 1973, at par. 12(g).)

Defendants argue that denial of good time in the case of a reformatory sentence is penologically and constitutionally justified, since the purpose of a reformatory sentence is to create a flexible program designed for rehabilitation, not punishment, and that the appropriateness of release in such a case is to be determined by successful rehabilitation (parole) rather than willingness to participate in a program (good behavior allowance).

In dealing with this subject, on the original motion to convene a three judge court, we wrote:

> "Without deciding, now, whether the legislative scheme rests on constitutionally acceptable premises, it is at least clear that, if in practice it confines youthful inmates longer than adults without actually offering them a program of rehabilitation, its operation would raise a serious constitutional question." 351 F.Supp. at 531.

■ We are presently required to rule whether plaintiffs' attack on the state practice judged in the light of the allegations of the complaint—which must be taken as true on a motion to dismiss—states a claim upon which relief can be granted. We hold that it does.

■ Even if we accept, *arguendo*, defendants' contention that denial of good time to those under reformatory sentences is justified by the reasonableness of requiring success in a rehabilitation program, the theory fails because the very heart of plaintiffs' claim is that they are being furnished no rehabilitative program. For example, plaintiffs allege that "There are numerous young people, who were sentenced under Penal Law § 75.10, in all adult prisons throughout New York State, and they are treated no differently from other inmates at such institutions, but are completely comingled with them, and receive no special treatment despite these special sanctions imposed upon them." (Amended Petition of November 9, 1973, at par. 8.)

If these allegations are established at trial, the props would be knocked from under defendants' constitutional justification. Indeed, the situation would then be identical with that in Bolling v. Manson, 345 F.Supp. 48 (D.Conn.1972) (three judge court), in which our sister court (per opinion of Smith, Circuit Judge) ruled that a comparable Connecticut statutory plan violated the equal protection clause. There, the court held that depriving juveniles and women sentenced to indefinite terms of good time credit was impermissible, because "[s]ince . . . the state has made no distinction in conditions of confinement based on the nature of an inmate's sentence, there is no basis in fact, much less a compelling state interest grounded in different treatment methods, behind the challenged discrepancy in good time" Id. at 51.

Defendants' attempted distinction between *Bolling* and the case at hand, on the ground that in the former the state conceded that all classes of prisoners in Connecticut were treated identically, is unacceptable on a motion to dismiss, since the allegation that in New York there is also an identity of treatment between adults and the plaintiff class must be accepted as true. Nor is the *Bolling*

decision to be disregarded because it adopted the "compelling necessity test" which has since been ruled inapplicable by the Supreme Court in "good time" cases (McGinnis v. Royster, 410 U.S. 263, 270, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973)), because *Bolling* held that— questions of compelling necessity aside —"there is no basis *in fact* . . . behind the challenged discrepancy in good time." 345 F.Supp. at 51 (emphasis added).

We need not determine at this time whether, as ruled by a New York State judge (People ex rel. Cromwell v. Warden, 74 Misc.2d 642, 345 N.Y.S.2d 381) (Supreme Court Bronx Co., 1973)), New York's denial of good time may violate the equal protection clause even if a rehabilitation program is available to plaintiff class when, nevertheless, the plaintiff class is treated identically with other prisoners.

The Supreme Court's decision in McGinnis v. Royster, *supra*, does not dictate a different conclusion. The issue there was different, involving only the denial of good behavior time against the minimum sentence for time served in jail before conviction. The Court ruled that such a denial, was rationally founded, and therefore constitutionally justified "on the ground that the risk of prematurely releasing unrehabilitated or dangerous criminals may well be greatest when the parole decision is made prior to expiration of the minimum sentence." 410 U.S. at 274, 93 S.Ct. at 1061. That is a far cry from holding that, where the constitutional support for denial of good time is claimed to be the need for successful completion of a rehabilitation program, the denial is permissible where no such program in fact exists.

## V.

There remain for trial the critical questions whether New York in fact provides a program of rehabilitation for the plaintiff class and whether the constitutional premise that a young person is more amenable to rehabilitation than an adult is factually valid.

The motions to dismiss are denied. The parties are instructed to prepare a schedule of discovery so that a trial date may be set.

It is so ordered.