**In the Matter of the Interests of ALJ, a Minor.**

**ALJ, Appellant (Defendant),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. C-90-9.**

Supreme Court of Wyoming.

June 30, 1992.

Leonard D. Munker, State Public Defender, and David Gosar, Appellate Counsel, of the Public Defender Program, for appellant.

Joseph B. Meyer, Atty. Gen., Michael Lee Hubbard, Deputy Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

MACY, Justice.

Appellant ALJ, a minor, appeals from the trial court's finding that he committed a delinquent act by recklessly endangering

others and from the court's order of disposition pertaining to his probation conditions.

We affirm in part and vacate in part.

Appellant raises the following issues:

ISSUE I

Is a person guilty of the crime of reckless[ ] endangering if he points an unloaded weapon at another? In other words, does the reckless endangering statute require that the actor place another in an actual state of danger?

ISSUE II

Are conditions J, L, N, and P of the appellant's probationary terms improper? More specifically, could the court order: A) searches of the appellant's person and abode without requiring a reasonable suspicion that a probationary term had been violated[ ], B) that appellant's driver's license was automatically revoked should he violate any of the terms of probation[ ], and C) that he pay the costs of his court appointed attorney without first inquiring into his ability to pay?

ISSUE III

Could the court place the appellant on three years of probation when it could only have sentenced an adult convicted of the same offense to one year of probation?

During the evening of November 22, 1989, Appellant attended a party held in a gravel pit near Greybull, Wyoming. An estimated forty to fifty people attended this party, most of whom were juveniles. Many of the partygoers were consuming alcohol. Appellant brought a .25 caliber semi-automatic pistol to this party, and, on four separate occasions, he pointed the gun at individuals who were in attendance. The police were not informed of Appellant's actions until several days after the party was held when the mother of one of the four victims told her son to notify the police.

The Big Horn County prosecutor filed a petition, alleging that Appellant committed a delinquent act by recklessly endangering the four individuals at the party in violation of Wyo.Stat. § 6-2-504(b) (1988). On June 7, 1990, a jury found the allegations in the petition were true. The jury was not instructed to make a finding regarding whether the gun was loaded. The district judge sentenced Appellant to an indeterminate period at the Wyoming Boys' School, but he suspended imposition of the sentence and placed Appellant on probation for three years.

Appellant's probationary conditions, among others, were that (1) Appellant would submit to random chemical testing for the presence of alcohol; (2) Appellant's driving privileges would be temporarily revoked with further revocation to be automatic if Appellant violated any probation condition or was arrested or ticketed for a traffic violation; (3) Appellant's parents would cooperate in residential checks at the probation officer's discretion; and (4) Appellant would reimburse the Wyoming public defender for the cost of his defense.

### Reckless Endangerment

■ Appellant contends that an actor can be guilty of reckless endangerment only if he actually puts the victim in danger. Wyo.Stat. § 6-2-504 (1988) provides in pertinent part:

(a) A person is guilty of reckless endangering if he recklessly engages in conduct which places another person in danger of death or serious bodily injury.

(b) Any person who knowingly points a firearm at or in the direction of another, whether or not the person believes the firearm is loaded, is guilty of reckless endangering unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another.

Appellant's position is that a person is not guilty of reckless endangering under this statute when he points an *unloaded weapon* at someone, "whether or not the person *believes* the firearm is loaded." (Emphasis added.) Appellant's argument is that, to give effect to the word "believes," the legislature must have meant that anyone who points a *loaded gun* at another is guilty, whether or not he believes the gun is loaded. According to Appellant's interpreta-

tion, the jury should have been instructed to make a finding regarding whether or not the gun was loaded.

Appellant relies upon cases from other jurisdictions to bolster his argument that, to be guilty, the actor must place the victim in actual danger. Like Wyoming has done, these other states have adopted, at least in part, the MODEL PENAL CODE's definition of reckless endangering, arguably making their statutory interpretations relevant.[1] However, none of the jurisdictions relied upon has adopted the same reckless endangering statute as Wyoming has adopted.

Appellant places emphasis on *State v. McLaren*, 135 Vt. 291, 376 A.2d 34 (1977). Vermont's reckless endangering statute, like the MODEL PENAL CODE, provides, " 'Recklessness and danger shall be presumed where a person knowingly points a firearm at or in the direction of another, whether or not the actor believed the firearm to be loaded.' " *McLaren*, 376 A.2d at 36. In *McLaren*, the court found that the presumption of danger could not be construed to make irrelevant the actual dangerous nature of the firearm itself. *Id. McLaren* is not persuasive in interpreting Wyoming's statute.[2]

■ Our rules of statutory interpretation are well established:

"[A]ll portions of an act must be read in pari materia, and every word, clause and sentence of it must be considered so that no part will be inoperative or superfluous," *Hamlin v. Transcon Lines*, Wyo., 701 P.2d 1139, 1142 (1985), and a statute should not be construed to render any portion of it meaningless, or in a manner producing absurd results. *Story v. State*, 755 P.2d 228, 231 (Wyo. 1988), *after remand*, 788 P.2d 617, *cert. denied*, —— U.S. ——, 111 S.Ct. 106, 112 L.Ed.2d 76 (1990) (citations omitted), quoted in *GN v. State*, 816 P.2d 1282, 1283 (Wyo.1991). We also recognize that ambiguity in a criminal statute should be resolved in favor of lenity. *Story*, 755 P.2d at 231.

■ We interpret § 6–2–504(b) to mean that, whenever an actor knowingly points a firearm at another, whether the firearm is loaded or not, he is guilty of reckless endangering, provided the firearm was not pointed for defensive purposes. The second clause of § 6–2–504(b) merely makes irrelevant the actor's belief as to the loaded or unloaded nature of the gun. While it is true that an ambiguous criminal statute should be resolved in favor of lenity, the rule is applicable only to the extent that an ambiguity exists. Wyoming's reckless endangering statute is not ambiguous.

Appellant also argues that it would be an odd construction to say a person is guilty of reckless *endangering* when no one has actually been endangered by the person's actions. To the contrary, an unloaded gun pointed at another creates a dangerous situation. The unknown and frequently violent reactions of persons having guns pointed at them, unloaded or not, create an obvious danger. Many people are killed each year with guns which the handlers

1. MODEL PENAL CODE § 211.2 (1962) provides:
   A person commits a misdemeanor if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury. Recklessness and danger shall be presumed where a person knowingly points a firearm at or in the direction of another, whether or not the actor believed the firearm to be loaded.

2. Other cases cited by Appellant include a series of Pennsylvania cases which require the prosecution to demonstrate that actual danger existed. In the leading Pennsylvania case requiring the existence of actual danger, *Commonwealth v. Trowbridge*, 261 Pa.Super. 109, 395 A.2d 1337 (1978), the court analyzed the Pennsylvania statute which stated, " 'A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.' " 395 A.2d at 1340. The court went on to point out that Pennsylvania had not adopted the second sentence of the MODEL PENAL CODE definition which stated, " 'Recklessness and danger shall be presumed where a person knowingly points a firearm at or in the direction of another, whether or not the actor believed the firearm to be loaded.' " *Id.* at 1341. This second sentence is almost identical to § 6–2–504(b). The Pennsylvania court found that, had Pennsylvania adopted the second sentence, criminal liability would be imposed for pointing an *unloaded* weapon. *Id.* The Pennsylvania court's analysis merely reinforces our interpretation.

*knew* were unloaded. *State v. Meier*, 422 N.W.2d 381, 385 (N.D.1988). Nothing is odd in protecting against the potential harm which exists any time a person points a gun at another.

### Probation Conditions

■ Appellant claims that the probation condition requiring him to submit to random chemical testing for the presence of alcohol violates his right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution and article 1, section 4 of the Wyoming Constitution. Appellant bases his contention on *Pena v. State*, 792 P.2d 1352 (Wyo.1990), which involved an adult parolee. In *Pena*, we found that, while parolees have lesser Fourth Amendment protections than law abiding citizens have, a parole officer, before he makes a search, must still have a "reasonable suspicion" that the parolee committed a parole violation. 792 P.2d at 1357–58. On the basis of the holding in *Pena*, Appellant argues that, since urinalysis is a search, his probation condition should have included a requirement that the probation officer must reasonably suspect that a probation violation exists before he orders a test.[3]

■ Appellant's argument necessarily assumes that: (a) urinalysis is a search; (b) Fourth Amendment protections apply to juveniles; and (c) adult and juvenile probationers are entitled to the same Fourth Amendment protections. We agree with Appellant's first assumption and adopt the Supreme Court's finding in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), that the testing of urine is a search. For this case, we can assume, without deciding, that Fourth Amendment protections apply to juveniles in adjudicatory proceedings.[4] However, the Fourth Amendment protections which apply to adult *probationers* do not necessarily apply to juvenile *probationers*. The dispositional phase of juvenile proceedings requires broad judicial discretion to accommodate the unique rehabilitative needs of juveniles. We hold that it is within the court's discretion to allow a probation officer to search a juvenile without reasonably suspecting that a probation violation exists.

Other courts have recognized that minors' constitutional rights available in the adjudicatory stage are not necessarily applicable in the dispositional stage. The Supreme Court has found that in adjudicatory hearings minors are entitled to those rights which comport with due process and fair treatment under the Fourteenth Amendment to the United States Constitution. *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). However, the Supreme Court in *In re Gault*, recognizing the uniqueness of the disposition stage, specifically limited its finding to the adjudicatory stage. 387 U.S. at 13, 31 n. 48, 87 S.Ct. at 1436, 1445 n. 31.

This difference between the adjudicative and dispositional phases reflects the broad discretion judges need for making an appropriate disposition. Wyoming requires that, when entering an order of disposition, the court must do what is best suited for the public safety, the preservation of families, and the physical, mental, and moral welfare of the child. *See* Wyo.Stat. § 14–6–229(a) (Supp.1991). To fulfill this mandate and to address the rehabilitative needs of juveniles, the court must have flexibility when it is formulating the probation conditions.

Wyo.Stat. § 14–6–229(f) (Supp.1990)[5] sets forth what terms and conditions a court may impose in an order of disposi-

---

3. Appellant also cites *Pena* for the proposition that probationers and parolees share the same Fourth Amendment protections. 792 P.2d at 1357 n. 10.

4. According to SAMUEL M. DAVIS, RIGHTS OF JUVENILES § 3.6 (2d ed. 1991), all states which have considered the applicability of the Fourth Amendment to juvenile proceedings have found that the Fourth Amendment is applicable.

5. Section 14–6–229(f)(vii) was amended by 1991 Wyo.Sess.Laws ch. 196, § 1 effective March 4, 1991.

tion. That section provides in pertinent part:

(f) As a part of any order of disposition and the terms and conditions thereof, the court may:

. . . .

(vi) Impose any demands, requirements, limitations, restrictions or restraints on the child, and do all things with regard to the child that his parents might reasonably and lawfully do under similar circumstances;

(vii) As a condition of permitting the child to live in the home, order the child . . . into counseling, treatment or another program designed to rectify problems which contributed to the adjudication.

Both of these provisions are broad enough to encompass chemical testing. In this case, alcohol was being consumed at the party. Appellant's background showed that he had previously been involved in an alcohol-related incident. The testing-for-alcohol condition was designed to avoid any future problems involving alcohol. We believe that, under these circumstances, the chemical-testing condition was appropriate.

■ Appellant next contests probation condition (n) which states, "Said minor's parents shall cooperate in all respects with said minor's probation officer and allow residential checks at the discretion of said officer." As he did in his argument concerning the chemical-testing condition, Appellant argues that the probation officer must reasonably suspect that a probation violation exists before he searches the minor's residence.[6] Our constitutional analysis regarding chemical testing is applicable to the probation condition requiring residential checks. Appellant's Fourth Amendment rights were not violated by the court allowing the probation officer to make residential checks without reasonably suspecting the existence of a probation violation. The condition was clearly within the court's discretion. Residential checks are an appropriate probation condition because they

allow the probation officer to verify that the minor is not consuming alcohol or otherwise violating his probation conditions.

■ Appellant's probation condition (1) states:

Said minor's driving privileges are hereby revoked. Said minor shall not drive a motor vehicle until January 20, 1991. Thereafter, if said minor is arrested or ticketed for a traffic violation or violates any condition contained herein, then said minor's driving privilege shall be automatically deemed revoked by virtue of this Court order.

Appellant contends that this condition is beyond the court's statutory authority. Pursuant to Wyo.Stat. § 14–6–229(f)(v) (Supp.1991), the court may "[r]estrict or restrain the child's driving privileges for a period of time the court deems appropriate, and if necessary to enforce the restrictions the court may take possession of the child's driver's license." Appellant objects to the court using the word "revoke" as opposed to using the words "restrict or restrain." In the context of condition (1), we see no discernible difference between "revoking" and "restraining or restricting" the child's driving privileges. By revoking the child's driving *privileges,* the court is not revoking the child's driver's license.

■ Appellant's probation condition (p) requires him to reimburse the public defender for the cost of his defense. Appellant claims that the trial court must inquire into his ability to reimburse the public defender before it can order reimbursement. We agree.

■ The State argues that the trial judge had sufficient knowledge to conclude that Appellant had the capacity to reimburse the public defender. The basis for this claim is that, at the dispositional hearing, Appellant's father testified to Appellant's steady work history. This evidence was not sufficient to qualify as an inquiry into Appellant's ability to pay.

---

**6.** We interpret Appellant's argument as merely going to whether the probation officer must reasonably suspect that a probation violation exists before he searches Appellant's residence.

Appellant has no standing to contest a violation of his parents' constitutional rights. *Johnson v. Schrader,* 502 P.2d 371 (Wyo.1972), *on reh'g,* 507 P.2d 814 (Wyo.1973).

Wyo.Stat. § 14-6-235(c) (1986) allows the court to order the child to pay for the cost of his defense; however, the statute does not specifically require the court to inquire into the child's ability to pay. As was said in *Schiefer v. State*, 774 P.2d 133 (Wyo. 1989) (Urbigkit, J., concurring in part and dissenting in part):

> The application of restitution and cost repayment statutes without a judicial finding of ability to pay are statutes designed as debt collecting devices masquerading as penal laws and contravene the constitutional prohibition against imprisonment for debt.

774 P.2d at 143. We hold that the court must inquire and find that the juvenile has the ability to pay before the court can order reimbursement of attorney fees, and we vacate that probation condition requiring Appellant to reimburse the public defender.

### Equal Protection

■ Appellant argues that his three-year probation term violates the Equal Protection Clauses of the Wyoming and United States Constitutions. He relies upon *Hicklin v. State*, 535 P.2d 743 (Wyo.1975), for the proposition that a probation term cannot exceed the maximum imprisonment term. Since the maximum sentence for reckless endangerment is one year, Appellant claims that his three-year probation term denies him equal protection under the law.

■ The right to equal protection under the law " ' mandates that all persons similarly situated shall be treated alike, both in the privileges conferred and in the liabilities imposed.' " *Small v. State*, 689 P.2d 420, 425 (Wyo.1984), *cert. denied*, 469 U.S. 1224, 105 S.Ct. 1215, 84 L.Ed.2d 356 (1985) (quoting *State v. Freitas*, 61 Haw. 262, 602 P.2d 914, 922 (1979)). When claiming an equal protection violation, the claimant must initially show that the classification in question treats similarly situated persons unequally. *State v. A.M.H.*, 233 Neb. 610, 447 N.W.2d 40 (1989). Adults placed on probation after they have been criminally prosecuted are not similarly situated to juveniles placed on probation after they have

been adjudicated delinquents; therefore, Appellant's argument must fail.

By enacting a juvenile code separate from the criminal code, Wyoming's legislature has recognized that juveniles and adults are not similarly situated. Juvenile proceedings are designed to rehabilitate and protect the juvenile, not to punish him. These goals of rehabilitation and protection are reflected throughout the juvenile code. Proceedings in juvenile court are equitable as opposed to being criminal. Juveniles are not convicted; they are merely adjudicated delinquents. By treating juveniles more gently than it treats adults, the legislature is compensating for juveniles' inherent lack of experience and maturity.

Since juvenile probations and adult probations are not similarly situated, Appellant suffered no denial of his right to equal protection under the law.

Affirmed in part and vacated in part.

URBIGKIT, C.J., filed an opinion concurring in part and dissenting in part.

THOMAS, J., filed a concurring and dissenting opinion.

CARDINE, J., filed a dissenting opinion in which THOMAS, J., joined.

URBIGKIT, Chief Justice, concurring in part and dissenting in part.

For a different reason than given by Justice Cardine, I cannot join in concurrence with the entire majority opinion. Directly stated, I do not find persons to be constitutionally second-class, or no-class, citizens under either the federal or state constitution when younger than some age limit, which is from time to time readjusted by the legislature to establish the juvenile court jurisdictional age limit by changing the age of majority.

I find no constitutional basis for the conversion of the misdemeanor offense for an adult into a confinement sentence of five days in jail and three years probation for a juvenile. An adult convicted of reckless endangerment cannot be confined or placed on probation for a term to exceed one year. The same criminal offense is utilized under this court's decision for the appellant, the only difference being age, to be subjected

to a criminal felony conviction penalty extended to three years. That divergence, even if found to be justified in state statute, is, in my opinion, unconstitutional under the Wyoming Constitution in violating both due process and equal protection.

This is not a youth-out-of-control juvenile court protective action. It is criminal conduct, prosecuted under the juvenile statute for an adult crime where, even if the youth had been prosecuted as an adult, *see* Wyo. Stat. § 14–6–203(e) and (f) (Supp.1991), the maximum confinement sentence, including periods of probation, could not have exceeded one year. Here, where this appellant was prosecuted as a minor under the juvenile code, we add judicial opportunity to confine and punish for a total time of three years.

This case involves punishment of appellant for the commission of a crime. Wyo. Stat. § 14–6–201(ix) (Supp.1991) states that a " '[d]elinquent act' means an act punishable as a criminal offense by the laws of this state or any political subdivision thereof." Wyo.Stat. § 14–6–203(a) states that "[t]he court has general jurisdiction in all matters and proceedings commenced therein or transferred to it by order of the district court concerning: * * * (ii) [a]ny minor alleged to have committed a delinquent act before attaining the age of majority."

The centrality of the criminal prosecutorial nature of this proceeding is reflected in the requirement for information to be contained in the juvenile petition, which includes:

A statement setting forth with particularity the facts which bring the child within the provisions of W.S. 14–6–203. If the basis of the petition is an alleged delinquent act or a need for supervision based upon a violation of the laws of the state or a political subdivision, the petition shall cite the alleged law violated.

Wyo.Stat. § 14–6–212(iv) (Supp.1991). This requires citation to the criminal statute allegedly violated as a basis for the "prosecutorial" proceeding when criminal conduct, *e.g.* delinquent act, is involved.

We are presented with an explicitly directed criminal proceeding relating to punishment assessed by society for the commission of a criminal offense. *Breed v. Jones,* 421 U.S. 519, 525, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). The criminal nature of the proceeding and the required recognition of constitutional interests surely is not in question in 1992. These proceedings can no longer be characterized as civil, where punitive disturbance of liberty interests of the individual as retribution for criminal conduct is presented. Chief Justice Warren Burger recognized the essence of the criminal nature of the juvenile proceeding in the double jeopardy discussion provided in *Breed,* 421 U.S. at 529, 95 S.Ct. at 1785–86. He first observed that the United States Supreme Court's response to the criminal nature of the juvenile proceeding "has been to make applicable in juvenile proceedings constitutional guarantees associated with traditional criminal prosecutions." *Id.* at 528–29, 95 S.Ct. at 1785–86 (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) and *Application of Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967)). Chief Justice Burger then stated:

We believe it is simply too late in the day to conclude, as did the District Court in this case, that a juvenile is not put in jeopardy at a proceeding whose object is to determine whether he has committed acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years. For it is clear under our cases that determining the relevance of constitutional policies, like determining the applicability of constitutional rights, in juvenile proceedings, requires that courts eschew "the 'civil' label-of-convenience which has been attached to juvenile proceedings," *In re Gault, supra,* at 50 [87 S.Ct. at 1455], and that "the juvenile process ... be candidly appraised." 387 U.S. at 21 [87 S.Ct. at 1440]. See *In re Winship, supra,* [397 U.S. at 365–366 [90 S.Ct. at 1073–1074].

As we have observed, the risk to which the term jeopardy refers is that traditionally associated with "actions intended to

authorize criminal punishment to vindicate public justice." *United States ex rel. Marcus v. Hess,* [317 U.S. 537, 548–549, 63 S.Ct. 379, 386–387, 87 L.Ed. 443 (1943) ].

*Breed,* 421 U.S. at 529, 95 S.Ct. at 1786 (footnote omitted).

The due process nature of the Wyoming juvenile code proceeding is statutorily recognized by the right to counsel, to be provided a jury trial and to exercise the privilege against self-incrimination.

> At their first appearance before the court the child and his parents, guardian or custodian shall be advised by the court of their right to be represented by counsel at every stage of the proceedings including appeal, and to employ counsel of their own choice.

Wyo.Stat. § 14–6–222(a) (1986). "A party against whom a petition has been filed or the district attorney may demand a trial by jury at an adjudicatory hearing." Wyo. Stat. § 14–6–223(c) (1986). "A child alleged to be delinquent may remain silent and need not be a witness against or otherwise incriminate himself, whether before the court voluntarily, by subpoena or otherwise." Wyo.Stat. § 14–6–223(a).

Specific issues inculcated into the majority decision which remain undiscussed in the opinion include: (1) a basic discrimination based on age in punishment against a minor in severity of sentence (when he is prosecuted as a minor instead of charged under the adult crime status and dependent on the happenstance of being younger or older than the age of majority); (2) conversion of a criminal misdemeanor into a felony punishment status by utilization of the juvenile code in substitution of the adult criminal court system; and (3) continuation of the juvenile court inflicted punishment into adulthood from initial juvenile court sentence.

The first examination is to determine whether this proceeding is criminal in nature and consequently requires application of associative constitutional protection under both the Wyoming and United States Constitutions. The United States Supreme Court has taken a forceful, but not necessarily consistent, pathway. The clearest recognition of the essential criminal nature of this kind of juvenile court proceeding was provided in *Breed.* Earlier recognition of the reality can be followed from *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) to *Application of Gault,* 387 U.S. 1, 87 S.Ct. 1428 and then continued in philosophic adaptation in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068 to *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

A child, merely on account on his minority, is not beyond the protection of the Constitution. As the Court said in *In re Gault,* 387 U.S. 1, 13 [87 S.Ct. 1428, 1436, 18 L.Ed.2d 527] (1967), "whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." [12]

---

[12] Similarly, the Court said in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74 [96 S.Ct. 2831, 2843–44, 49 L.Ed.2d 788] (1976):

> "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights."

*Bellotti,* 443 U.S. at 633, 99 S.Ct. at 3042–43.

The exception to the constitutionally required protective designation is found in *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), which considered the right to a jury trial for due process in juvenile court proceedings. That case has no Wyoming relevance since the Wyoming statute guarantees that right which honors the state constitutional criteria. *See* Wyo.Stat. § 14–6–223(c) and Wyo. Const. art. 1, § 10, "right * * * to a speedy trial by an impartial jury[.]"

In *Kent,* 383 U.S. 541, 86 S.Ct. 1045, the charged juvenile was subjected to a waiver order for adult prosecution without adequate recognition of any due process right. The United States Supreme Court initiated its decision by discussion that appellant's contentions

> suggest basic issues as to the justifiability of affording a juvenile less protection than is accorded to adults suspected of

criminal offenses, particularly where, as here, there is an absence of any indication that the denial of rights available to adults was offset, mitigated or explained by action of the Government, as *parens patriae*, evidencing the special solicitude for juveniles commanded by the Juvenile Court Act.

*Id.* at 551–52, 86 S.Ct. at 1052. In considering rights to due process and assistance of counsel, the United States Supreme Court remanded for a proper waiver hearing to be held where due process was afforded.

*Kent* was followed by the landmark case of *Application of Gault*, 387 U.S. 1, 87 S.Ct. 1428. In thoughtfully synthesizing philosophy and constitutional law, Justice Fortas, in considering any criminal characterization of the proceeding, stated:

> [T]he highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable. And in practice, as we remarked in the *Kent* case, *supra*, the results have not been entirely satisfactory. Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts...." The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness. The Chairman of the Pennsylvania Council of Juvenile Court Judges has recently observed: "Unfortunately, loose procedures, high-handed methods and crowded court calendars, either singly or in combination, all too often, have resulted in depriving some juveniles of funda-mental rights that have resulted in a denial of due process."

*Application of Gault*, 387 U.S. at 17–19, 87 S.Ct. at 1438–39 (footnotes omitted).

The United States Supreme Court revisited the relationship of juvenile court proceedings to constitutional rights of the juvenile for a requirement of proof of the offense beyond a reasonable doubt in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068. The United States Supreme Court first considered the reasonable doubt standard:

> Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

*Id.* at 364, 90 S.Ct. at 1073. The United States Supreme Court then turned

> to the question whether juveniles, like adults, are constitutionally entitled to proof beyond a reasonable doubt when they are charged with violation of a criminal law. The same considerations that demand extreme caution in factfinding to protect the innocent adult apply as well to the innocent child. We do not find convincing the contrary arguments of the New York Court of Appeals. * * * In effect the Court of Appeals distinguished the proceedings in question here from a criminal prosecution by use of what *Gault* called the " 'civil' label-of-convenience which has been attached to juvenile proceedings." 387 U.S., at 50, 87 S.Ct. at 1455. But *Gault* expressly rejected that distinction as a reason for holding the Due Process Clause inapplicable to a juvenile proceeding. * * * We made clear in that decision that civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for "[a] proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *Id.*, at 36, 87 S.Ct. at 1448.

*In re Winship,* 397 U.S. at 365–66, 90 S.Ct. at 1073.

Within the scope of decisive United States Supreme Court case law for application of the United States Constitution and the provisions of the Wyoming Constitution in conjunction with the facts of this case, we need to look at the relevant issues created. Those difficult controversial questions are presented for this appeal in what is answered so simply by the majority decision. I dissent in suggestion that deep-seated constitutional questions regarding discrimination based on age, misdemeanor conviction, and a felony sentence in juvenile court application to adulthood should author a more serious review, both in constitutional law and in practical societal relationships in a modern world where strong executive and legislative efforts to reduce even further the age of majority are underway. *See, e.g.,* S.F. 103 and H.B. 203, Age of Majority, and S.F. 83, Court Ordered Placements of Juveniles, introduced in the 1992 Wyoming "budget" legislative session. By almost an afterthought, this court is faced with the principal issue of an unloaded gun assault and now fails to recognize and adequately analyze the real significance of this case for the future of Wyoming law development. *See, e.g., United States v. R.L.C.,* — U.S. —, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992).

Reasoned consideration of the juvenile court system requires recognition of the fundamental nature of the liberty interest to then be related to a conclusion that it does not first arise with attained adulthood. In 1987, Chief Justice Rehnquist acknowledged "the individual's strong interest in liberty. We do not minimize the importance and fundamental nature of this right." *United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987). *See also Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982) in discussion of equal protection enforcement of fundamental rights.

Thoughtfully examined principles would lead to the conclusion that the fundamental interest of liberty is no less real for a juvenile faced with incarceration or probation than is the case for an adult. After an exhaustive and thoughtful examination of the fundamental interest of liberty in general, the California Supreme Court in *People v. Olivas,* 17 Cal.3d 236, 131 Cal.Rptr. 55, 64, 551 P.2d 375, 384 (1976) related the interest to the defendant, a minor:

No reason has been suggested, nor can we conceive of any, why the concern for personal liberty implicit in both the California and federal Constitutions is any less compelling in defendant's case. We believe that those charters are no less vigilant in protecting against continuing deprivations of liberty than are their due process clauses in protecting against the initial deprivation of that liberty. We conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions.

That court had related:

The origins of the personal liberty concept under consideration today and encompassed within the Fourteenth Amendment to the United States Constitution and * * * the California Constitution can be traced as far back in Anglo-American legal history as the Magna Carta. (See Schwartz, 1 The Bill of Rights: A Documentary History (1971) pp. 6–7; Shattuck, *The True Meaning of the Term "Liberty" in Those Clauses in the Federal and State Constitutions which Protect "Life, Liberty, and Property,"* supra, 4 Harv.L.Rev. at pp. 369–374.) The declaration of certain basic rights within one short chapter of that instrument has come to be viewed as the foundation for the protections guaranteed the defendant in our system of criminal justice. Without a doubt, Chapter 39 of the Great Charter implicitly recognizes the overwhelming importance and value attached to the concept of personal liberty by those who secured its guarantees at Runnymede. This same concern and respect for the concept of personal liberty is embodied in our concept of due process and has found repeated expres-

sion in both this court and the United States Supreme Court.

*Olivas,* 131 Cal.Rptr. at 62–63, 551 P.2d at 382–83 (footnote omitted). *See also People v. Trevisanut,* 160 Cal.App.3d Supp. 12, 207 Cal.Rptr. 921, 927 (1984), for application to a juvenile; *In re Hop,* 29 Cal.3d 82, 171 Cal.Rptr. 721, 623 P.2d 282 (1981); and *People v. Sandoval,* 70 Cal.App.3d 73, 138 Cal.Rptr. 609, 619 (1977)

Our sister state of Montana has similarly recognized the same abiding responsibility in examining its constitutional provisions which are similar to those found in the Wyoming Constitution:

> The preamble to the Montana Constitution states in part:
>
> "We the people of Montana ... desiring ... to secure the blessings of liberty ... do ordain and establish this constitution."

Article II is the Declaration of Rights. Article II, Sec. 3 states in part:

> "All persons are born free and have certain inalienable rights. They include ... the rights of ... enjoying and defending their lives and liberties...."

Article II, Sec. 4, the equal protection clause, states in pertinent part:

> "The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws."

Article II, Sec. 17, the due process clause, states:

> "No person shall be deprived of life, liberty, or property without due process of law."

*Matter of C.H.,* 210 Mont. 184, 683 P.2d 931, 940 (1984). The Montana Supreme Court concluded "that the deprivation of the physical liberty of [the juvenile] for a period of 45 days is sufficient to constitute an infringement upon her right of physical liberty" and presented an interest that was within the constitutionally guaranteed rights of the Montana Constitution. *Id.*

Constitutional protection for the liberty interest intrinsic within the Wyoming constitutional guarantees likewise has a significant recognition in our case law.[1] *State v. Langley,* 53 Wyo. 332, 84 P.2d 767 (1938), liberty and property interest prosecution under the Unfair Competition Act; *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne,* 371 P.2d 409, 417 (Wyo.1962), unconstitutionality of the Fair Trade Act recognizing that liberty is the right "to do all that is not made unlawful[,]" and further in citation of *Langley* and quotation from the originating case of *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886):

> "[T]he very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

*Bulova Watch Co.,* 371 P.2d at 418–19.

Further Wyoming cases recognizing the liberty interest constitutional protection include *Holm v. State,* 404 P.2d 740 (Wyo. 1965), involuntary hospitalization, unconstitutionality of a statute superseding court rules of evidence and procedure and invading a due process liberty interest; *Jordan v. Delta Drilling Co.,* 541 P.2d 39 (Wyo. 1975), wrongful death statute cannot constitutionally deny illegitimate child rights derived from deceased parent; *State in Interest of C,* 638 P.2d 165 (Wyo.1981), fundamental right and strict scrutiny test where parental rights are questioned; *Matter of GP,* 679 P.2d 976 (Wyo.1984) and *Matter of Adoption of JLP,* 774 P.2d 624 (Wyo.1989), father's right in parental termination case; *Washakie County School Dist. No. One v. Herschler,* 606 P.2d 310

---

1. The concern expressed in *State v. Langley,* 53 Wyo. 332, 340, 84 P.2d 767 (1938) by Chief Justice Blume, although involving a totally different subject, perhaps deserves recognition by recitation:

> The legislation now before us would probably not cause more than ordinary anxiety, or deserve greater consideration than the ordinary constitutional question, were it not for the times in which we live, the depression now existing, the unrest now prevailing, the mass of social legislation in the last few years, the wonder whither we are going, and the frequent queries whether courts are drifting merely with the tide or are rendering their decisions with that steadfast judgment as is their wont.

(Wyo.), *cert. denied* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980), equal educational opportunity is a fundamental interest requiring strict scrutiny to invalidate statutory classification; *Simons v. Laramie County School Dist. No. One,* 741 P.2d 1116 (Wyo.1987), right to education as a constitutional liberty interest invoking the strict-scrutiny criteria; *State v. Shunneson,* 743 P.2d 1275 (Wyo.1987), right to pursue one's chosen means of livelihood; and *Hoem v. State,* 756 P.2d 780, 784 (Wyo. 1988), majority and Thomas, J., specially concurring, regarding medical review panel classification invoking equal protection and due process guarantees requiring heightened scrutiny test application.

In background precedent to support a number of state court decisions which will hereafter be discussed, authority from federal cases derived from application of the Federal Juvenile Delinquency Act is utilized. Obviously, the United States Congress did not like what the state courts did, and consequently, the pervasive adaptation provided for juveniles was to limit any incarceration to the term provided for an adult in violation of the underlying criminal statute. Although the most recent United States Supreme Court decision follows a further question to find an answer regarding application of sentencing guidelines to the statutory limitation to create a definable limit to the appropriate term for the juvenile, the recent case of *R.L.C.,* 112 S.Ct. 1329 is demonstrative that the federal system does not presently ignore preclusive rights of juveniles to have no more extended sentences than would be provided for adult miscreants. Particular note should be taken of the recognition of Justice Scalia, concurring in part and concurring in the judgment, that "[t]he rule of lenity * * * prescribes the result when a criminal statute is ambiguous: the more lenient interpretation must prevail." *Id.* at 1339. With the tidal movement within this nation during the last twenty years to reduce the age of majority, the recognition that lenity has a place regarding the juvenile courts' capacity to sentence for a period beyond majority cannot be casually disregarded.

We need then in current examination to consider three facets of the entire issue, each sequentially presented in this appeal: (1) the abject age discrimination for minimized punishment when adulthood is achieved for the identical criminal conduct invoking more serious responsibility for the minor; (2) conversion of a misdemeanor into a juvenile felony result; and (3) juvenile court jurisdictional effectiveness beyond adulthood.

In answering all three questions, I would adopt the constitutional concepts dramatized in *Olivas,* 551 P.2d 375 and the modern statutory structure provided by federal law which defines operational recognition of the juvenile's right to equality of treatment and constitutional protection as defined in *Breed, In re Winship, Gault* and *Kent.* 18 U.S.C. § 5037(c)(1)(B) provides the statutory criteria limiting detention to the " 'maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult.' " *R.L.C.,* 112 S.Ct. at 1330. Earlier recognized is that detention for the juvenile, about which this appeal is enfolded, is criminal in nature. *Breed,* 421 U.S. at 529, 530, 95 S.Ct. at 1785–86, 1786. With recognition of the national confinement systems now emplaced for those persons who have not achieved adulthood, it is too late to continue the fiction that we have a quid pro quo by civil detention for supervisory control of the juvenile's free exercise of liberty as something different than confinement for his older brother or sister. The compelling characterization of treatment and rehabilitation for the youthful offender is, in today's confinement society, an optimistic expectancy that has ceased to retain validity.

The *Olivas* court accurately advanced in partial quotation from the earlier California case of *Ex parte Herrera,* 23 Cal.2d 206, 143 P.2d 345, 348 (1943):

"The great value in the treatment of youthful offenders lies in its timeliness in striking at the roots of recidivism. Reaching the offender during his formative years, it can be an impressive bulwark against the confirmed criminality

that defies rehabilitation, for it is characteristic of youth to be responsive to good influence as it is susceptible to bad."

There remains as much wisdom in that observation today as it held over 30 years ago. However, we are no longer able to find such a generalization, standing alone, as sufficient justification for governmentally imposed inequality where deprivations of personal liberty are involved.

*Olivas,* 131 Cal.Rptr. at 65, 551 P.2d at 385.

The subject is similarly addressed in Samuel M. Davis, *Rights of Juveniles: The Juvenile Justice System,* § 6.6 at 6–22.4 to 6–22.5 (2d ed. 1991) (emphasis in original and footnotes omitted):

> It was reliance on the rehabilitative purposes of the juvenile court, however, that promoted most courts, prior to the *Gault* decision, to deny application of constitutional safeguards to the juvenile process. As a basis for depriving constitutional rights, this justification was thoroughly discredited in *Kent* and *Gault.* Even in *McKeiver v. Pennsylvania* the Court acknowledged that the rehabilitative processes of the juvenile court had largely failed.
>
> Moreover, in light of the number of successful claims being brought in favor of a right to treatment for juveniles * * *, the evidence continues to mount that reliance on the juvenile process as rehabilitative rather than punitive in nature has paid more heed to rhetoric than to reality.

Not all courts have swept aside differential treatment on the basis of the tenuous distinction between punishment and treatment, however. In *In re Wilson* the Pennsylvania Supreme Court was not persuaded that there was a rational basis sufficient to warrant differential sentencing according to age. The court acknowledged that longer commitment *might* be authorized in some cases if (1) the juvenile has notice at the outset of all factors upon which the court might base an adjudication of delinquency; (2) the conclusions on which a delinquency adjudication is based, plus all facts supporting the conclusions, are set forth in the court's order; and (3) it appears that the longer commitment will insure rehabilitative treatment and not just deprivation of liberty. If any one of these factors is absent, the court held, there is no constitutionally valid distinction between juvenile and adult offenders to warrant subjecting one class to a longer maximum commitment for the same offense.

In some instances, statutory limitations seek to avoid the problem of differential treatment. The recently revised North Carolina juvenile code, for example, provides for indefinite as well as definite commitments, but it also provides that in no event may the period of commitment exceed what would be authorized for commitment of an adult.[85]

---

[85] N.C.Gen.Stat. § 7A–652(c) (Supp.1989); *see* La.Code Juv.Proc. art. 89(C) (1990); Tenn.Code Ann. § 37–1–137(a)(1)(B) (Supp.1990) (in no event may juvenile be committed for longer period than possible in case of adult convicted of same offense).

There is obviously a body of law which, in general, predates *Gault* and, in particular, its successor *Breed* and more current statutory changes found in federal and some state court cases which consider that either the detention of the juvenile is noncriminal or the differentiated longer detention based on the younger age is justified. *People ex rel. Cromwell v. Warden,* 74 Misc.2d 642, 345 N.Y.S.2d 381 (1973), reformatory custody to educate and rehabilitate constitutes a due process requirement. Consequently, for that institution on Rikers Island, which has achieved infamous recognition in current time, a 1973 indeterminate sentence status for youthful offenders subject to the Parole Commission Act was constitutional. The case, however, determined that equal treatment to award grant of good behavior time was required. The case at best provides scant authority for the topic presented in this appeal. Coincidentally, the case was rendered while the federal law was in the process of transition as discussed in the 1979 change in *United States v. Amidon,* 627 F.2d 1023, 1026 (9th Cir.1980) (footnotes omitted):

Amidon's second claimed constitutional error is that sentencing under the YCA [Youth Corrections Act] irrationally discriminates against those between the ages of 18 and 26, in violation of the equal protection and due process clauses. We do not reach this contention because we conclude that Congress has clearly evidenced its intention in the Federal Magistrates Act of 1979 that a youth may not be sentenced to a term of confinement under the YCA that exceeds the statutory maximum that an adult could receive.

Amidon is correct when he asserts that it is inequitable and unjust to permit imposition of the six year sentence under the YCA for offenses for which an adult, or a juvenile, could be sentenced to just six months. Congress has noted this inequity and recently has taken steps to remedy it. Federal Magistrate Act of 1979, Pub.L. No. 96–82, 18 U.S.C. § 3401 (Supp.1980). It is clear that, in doing so, Congress has rejected the earlier conclusions of this court and others that the rehabilitative purposes underlying the YCA justify a longer confinement, *see, e.g., United States v. Leming*, 532 F.2d 647 (9th Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 749 (1976); *Harvin v. United States*, 445 F.2d 675, 682 (D.C.Cir.1971) (en banc).

This rejection is well warranted. As the government conceded at oral argument, the original rehabilitative purposes of the YCA have generally been abandoned. *See* Partridge, Chaset and Eldridge, "The Sentencing Options of Federal District Judges," 84 F.R.D. 175, 200 (1980).

Compare, for example, *United States v. Lowery*, 726 F.2d 474 (9th Cir.1983), *cert. denied* 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 73 (1984); *Brisco v. United States*, 368 F.2d 214 (3rd Cir.1966); and *Cunningham v. United States*, 256 F.2d 467 (5th Cir.1958). Any question on the subject is now superseded by *R.L.C.*, 112 S.Ct. 1329.[2]

Wisconsin, in the case of *J. K. v. State*, 68 Wis.2d 426, 228 N.W.2d 713 (1975), concluded that an indeterminate sentence of a fifteen-year-old which could last until age eighteen was not unconstitutional when compared to the potentiality of incarceration of a similarly situate adult. Likewise, *In re State in Interest of K.V.N.*, 116 N.J.Super. 580, 283 A.2d 337, 343 (1971), *aff'd* 60 N.J. 517, 291 A.2d 577 (1972), found that "classification based on age is not *per se* invalid." The Illinois appellate court decision of *In Interest of T.L.B.*, 184 Ill.App.3d 213, 132 Ill.Dec. 534, 539 N.E.2d 1340 (1989) demonstrates clearly definable differences. The Illinois case law is not comparable where recognizing that the juvenile has a right of choice to be prosecuted as an adult for any conduct which constitutes the criminal offense, *id.* 132 Ill.Dec. at 541, at 1347, and no discussion is provided regarding retention past the age of majority as a jurisdictional concept for the juvenile court. Furthermore, the cases tend to relate to general delinquency rather than one single criminal conduct event. *Id.; In Interest of T.D.*, 81 Ill.App.3d 369, 36 Ill.Dec. 594, 401 N.E.2d 275 (1980); *In Interest of F.L.W.*, 73 Ill.App.3d 355, 29 Ill.Dec. 387, 391 N.E.2d 1070 (1979) (see, however, the dissent of Justice Craven, *id.* 29 Ill.Dec. at 390, at 1073); *In re Blakes*, 4 Ill.App.3d 567, 281 N.E.2d 454 (1972); *In re Sekeres*, 48 Ill.2d 431, 270 N.E.2d 7 (1971), *cert. denied* 404 U.S. 1008, 92 S.Ct. 691, 30 L.Ed.2d 656 (1972); *In re Presley*, 47 Ill.2d 50, 264 N.E.2d 177 (1970).

The present California law has a structure similar to the Federal Youth Corrections Act provisions. *See In re Eric J.*, 25 Cal.3d 522, 159 Cal.Rptr. 317, 601 P.2d 549 (1979), where criminal term confinement provisions established the maximum for juvenile detention. Additionally, the California rule for misdemeanor offenses is finite-

---

**2.** Consistency in the authored standards by the United States Supreme Court for the constitutional protection for juveniles is certainly not found to be a smooth and direct pathway as illustrated by two additional United States Supreme Court decisions. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), burden of proof required for termination of parental rights, compared to *Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), where preventive detention before a hearing for the juvenile was considered.

ly determined. *In re Samuel C.*, 74 Cal. App.3d 351, 141 Cal.Rptr. 431 (1977); *In re Lyerla*, 18 Cal.3d 20, 132 Cal.Rptr. 443, 553 P.2d 603 (1976). Furthermore, appellant does not present us with the dangerousness determinate concept in California law. *People v. Superior Court of Los Angeles County*, 142 Cal.App.3d 29, 190 Cal.Rptr. 721 (1983).

The one case cited in the majority, *In re Interest of A.M.H.*, 233 Neb. 610, 447 N.W.2d 40 (1989), is not factually relevant including the result of the case which reversed detention commitment on the basis that a status offender determination had not been judicially made. The sentence confinement for the offense of driving without a license was unreasonable and reversible. The issue first raised on appeal of equal protection for juvenile confinement greater than the misdemeanor offense *did violate* equal protection when the juvenile offense was compared to the adult offense of driving without an operator's license. In comparison to Wyoming law, the factual situation presented would not have been generally handled in juvenile court. Secondly, no indication was given of the retentive jurisdiction of the juvenile court to sentence beyond majority.

This latter subject was specifically addressed by the Arizona Supreme Court in *Appeal, in Maricopa County Juvenile No. J–86509*, 124 Ariz. 377, 604 P.2d 641 (1979), *cert. denied* 445 U.S. 967, 100 S.Ct. 1660, 64 L.Ed.2d 245 (1980), where that court determined that any jurisdiction for a juvenile commitment terminates at the age of majority and any provision of the statute extending that authority beyond that age was unconstitutional. In declaring the Arizona statute unconstitutional, the court recognized that "[n]owhere is there a grant by the Arizona Constitution of authority for persons eighteen years of age or older to be treated as children." *Id.* 124 Ariz. at 379, 604 P.2d at 643. Obviously, an intermediate appellate court did not like the Arizona Supreme Court decision. *Appeal in Maricopa County Juvenile Action No. J 86843*, 125 Ariz. 227, 608 P.2d 804 (1980).

The line of departure in the morass of the juvenile detention cases is self-evident.

Those authors justifying an unequal system of sentencing dependent upon age speak of rehabilitation and training, while those who seek equality and equivalency of penal sanctions for criminal conduct speak of accountability, punishment and, even more quietly on occasion, warehousing. *See, e.g., People In Interest of M.C.*, 774 P.2d 857, 864 (Colo.1989), Mullarkey, J., dissenting, and *State v. Rice*, 98 Wash.2d 384, 655 P.2d 1145 (1982) (majority opinion and Dore, J., dissenting, *id.* 655 P.2d at 1155).

The necessarily confined concept of rehabilitation as justification for discriminatory sentencing was recognized by the Pennsylvania court in *In re Wilson*, 438 Pa. 425, 264 A.2d 614, 618 (1970) (footnote omitted):

There can be circumstances under which a longer maximum commitment may be permissible, but only if three factors are present: (1) The juvenile must have notice at the outset of the proceedings of any and all factors upon which the state proposes to base the adjudication of delinquency; (2) the ultimate conclusions upon which the finding of delinquency is based, and the facts supporting each of them, must be clearly found and set forth in the adjudication; and (3) it must be clear that the longer commitment will result in the juvenile's receiving appropriate rehabilitative care and not just in his being deprived of his liberty for a longer time. If all three of these conditions are present, a juvenile may be deprived of his liberty for a period in excess of the maximum sentence which he could have received if treated as an adult.

The Connecticut court recognized the similar unusual circumstance case in *State v. Brezina*, 28 Conn.Supp. 132, 253 A.2d 676, 677 (1969):

In the interest of achieving reasonable uniformity of sentencing, it is our view that, in the absence of highly extraordinary circumstances not present in this case, a person committed to the reformatory ought not to be held in confinement longer than the statutory maximum term for the particular offense involved.

I would recognize the general substance of exceptional circumstances including dan-

gerousness and general delinquency, but otherwise the state when properly acting in the concept of *parens patriae* should not intermix delinquency punishment and offender status. "[T]he individual's right to personal liberty is a fundamental right for equal protection purposes." *Doe v. Norris,* 751 S.W.2d 834, 842 (Tenn.1988). Lenity should be applied to juvenile confinement cases resulting from criminal conduct equally with its application to the adult criminal structure of state law. *R.L.C.,* 112 S.Ct. at 1339, Scalia, J., concurring in part and concurring in the judgment.

Within the structure of law created by this state's constitutional precepts, the United States Supreme Court decisions and the general law, each defining rights of juveniles, it is necessary to first establish and then apply the facts of this case. The factual circumstances reveal appellant, born March 1, 1974, was fifteen years and eight months old on the date of this offense. The criminal offense for which the juvenile proceeding was pursued involved reckless endangerment by waiving a gun around and pointing it at persons present at a teenage countryside nighttime drinking bash. The maximum sentence for reckless endangerment under Wyo.Stat. § 6–2–504(c) (1988) is one year.

Appellant was sentenced by order entered on September 27, 1990 to five days in jail and an indeterminate period in the Wyoming Boys School in Worland. The Boys School confinement was suspended pending a three-year probationary term of which two years would be supervised and the final year unsupervised. This sentence will expire on September 27, 1993, although the charged individual will then have reached the age of majority, nineteen, on March 1,

1993. Consequently, his probation will not expire until nearly seven more months after he achieves adulthood. Under the sentence, until September 27, 1993, he will continue to be exposed to incarceration at the Boys School for probation violation, even though no longer a minor and no longer subject to the stated jurisdiction of the juvenile court (age nineteen). If the Boys School would not keep him, which they would not, would he then be incarcerated in the state penitentiary? Under the status of the law as now changed by the 1992 session of the Wyoming State Legislature, transfer to the penitentiary can no longer occur. 1992 Wyo.Sess.Laws ch. 25. Then remaining for adult punishment for any violation of probation as a result of the juvenile court disciplinary action is only a county jail sentence.

The concern I have is that the law should be clarified and carefully analyzed so that the district bench is, under the pressures to furnish answers where none exist, clearly directed to jurisdictional questions by specific and adequately enumerated court decisions.[3] Defined legislative direction to extend juvenile court proceedings into adulthood is not found in present Wyoming statutes. If I were to apply either the legislative history of the majority opinion or the lenity of Justice Scalia's opinion concurring in part and concurring in the judgment in *R.L.C.,* I would find minimal authority in Wyoming's present statutory system to grant authority to the juvenile court which specifically is not provided. Where the minor is the subject matter of jurisdiction, Wyo.Stat. § 14–6–203, and the age of majority is nineteen years, Wyo.Stat. § 2–1–301(a)(xxvi) (1980), I cannot find any possible constitutional validity to the provisions

---

**3.** This is not a happy record. In the presentence investigation, in an extensive testimony provided to the juvenile court, it was revealed that between the date of this endangerment incident, November 22, 1989, and the sentencing hearing, September 7, 1990, the juvenile had arguably been involved in five driving offenses. His record revealed three other drinking or driving offenses predating the occurrence. Conjunctive with the reckless endangerment charge involved here, appellant had initially been charged in juvenile court with a totally separate arson offense, which was not pursued by the prosecuting attorney.

. The sentence, in addition to the five-day jail sentence, the indeterminate sentence at the Boys School and the three years probation, provided very stringent and carefully considered supervisory controls and restrictions on the conduct and activities of the juvenile. At issue here is not the propriety of those carefully thought-out efforts of the juvenile judge, but rather the basic jurisdiction to be derived from criminal prosecution of supervision and penal restraint for a period of time which could not have occurred to an individual sufficiently older to have escaped the jurisdictional confines of the juvenile court.

of Wyo.Stat. § 14–6–231(c)(ii) (Supp.1991) which accords to the juvenile court authority to continue supervision although its jurisdiction had ended at age nineteen. Wyo. Stat. § 14–6–203(a)(ii).

I object to any adaptation of Wyoming law on constructional and constitutional bases which converts misdemeanors for adults into felony confinement offenses for minors and denies equal justice based on an age determinate as an attribute of our juvenile court system. I especially reject any construction of our law which construes juvenile court authority to continue past the age of jurisdiction into adulthood. *Breed, In re Winship,* and *Gault* should teach that a statutorily established age of majority should not provide a dividing line to deny constitutional rights for due process and liberty to juvenile offenders.

Consequently, I concur in part and dissent in part.

THOMAS, Justice, concurring and dissenting.

I agree with the disposition of this case as reflected in the majority opinion except for the portion addressing the aspect of the terms of the probation that requires reimbursement of the public defender for the cost of defense. As to that aspect of the case, I agree with the views of Justice Cardine articulated in his dissenting opinion in which I join.

CARDINE, Justice, dissenting, with whom THOMAS, Justice, joins.

I dissent from the majority's decision to vacate the portion of appellant's probation which required him to reimburse the public defender for his defense. The decision to vacate that portion of appellant's probation sentence is made without sufficient rationale, explanation or precedent.

The majority cites an opinion concurring in part and dissenting in part for the proposition that "application of restitution and cost repayment statutes without a judicial finding of ability to pay are statutes designed as debt collecting devices masquerading as penal laws and contravene the constitutional prohibition against imprisonment for debt." Maj. op. at 313 (citing

*Schiefer v. State,* 774 P.2d 133, 143 (Wyo. 1989) (Urbigkit, J., concurring in part and dissenting in part)). That proposition represents idealism that is not required by statute nor supported by decisions of this court. The concern for avoiding imprisonment for debt is satisfied in all cases, juvenile and adult, by the opportunity to make a showing of inability to pay prior to revocation. Since an opportunity to make a showing of inability to pay exists, there is no need to restrain judges' jurisdiction to impose reimbursement for defense costs or subject each of those orders to review by this court to determine if there was adequate inquiry into the juvenile's ability to pay.

When we have required an inquiry into the defendant's ability to pay, we have done so only when a statutory provision such as W.S. 7–6–106(c) requires that the court "consider the financial resources of the person * * *." *See Seaton v. State,* 811 P.2d 276, 284 (Wyo.1991). But consideration of financial resources of the person does not equate to the person having funds in the bank to presently pay. The defendant may be highly skilled, employable at substantial compensation, and have a decided future ability to pay. The court's order to pay must be reasonable and under circumstances that rest upon a probability of payment. However, with respect to this case, the express requirement of W.S. 7–6–106(c) (1987) that the trial court inquire into ability to pay is not present in the juvenile statute which allows the court to order reimbursement for public defender services.

W.S. 14–6–235(c) provides:

Legal services rendered to a child for his benefit and protection are necessities which the child's parents or any person obligated by law for the child's support may be held responsible. The court may order that *all or any part of the costs and expenses enumerated* in subsection (b) of this section except jury fees, costs and travel expenses, *be reimbursed* to the county *by the child,* his parents or any person legally obligated for his support, or any of them jointly and severally, *upon terms the court may direct.* [emphasis added]

Although the majority neglected to do so, it is important to read this section in conjunction with the unique juvenile court jurisdictional statutes. W.S. 14–6–203(b) states:

> Coincident with proceedings concerning a minor alleged to be delinquent, neglected or in need of supervision, the court has jurisdiction to:
>
> \* \* \* \* \* \*
>
> (ii) *Order any party to the proceedings to perform any acts, duties and responsibilities the court deems necessary;* or
>
> (iii) Order any party to the proceedings to refrain from any act or conduct the court deems detrimental to the best interest and welfare of the minor or essential to the enforcement of any lawful order of disposition of the minor made by the court. [emphasis added]

This broad jurisdictional provision expresses the legislature's desire to give juvenile courts broad power for determining what is appropriate for a minor. These broad jurisdictional provisions are absent from the adult statute providing for reimbursement for public defender costs. Instead, the adult provision requires that the judge inquire into ability to pay. W.S. 7–6–106(c) (1987). When a statute requires inquiry into ability to pay, this court should require that district courts do so. However, when the statute does not contain that requirement, this court should refrain from engaging in judicial legislation by creating a requirement where none exists. Thus, we have said: "If the language of a statute is clear and unambiguous, we must abide by the plain meaning of the statute \* \* \*." *Deloges v. State ex rel. Wyoming Workers' Compensation Div.*, 750 P.2d 1329, 1331 (Wyo.1988); *see also West v. Wyoming State Treasurer*, 822 P.2d 1269, 1272 (Wyo.1991).

While the majority cites our rules of statutory construction, it does not heed them. This statute is not ambiguous. There is no need to resort to "construction" or "interpretation" or the addition of requirements under the guise of statutory interpretation. The clear and unambiguous plain meaning of this statute is that in a juvenile proceeding the district court is not required to inquire into the juvenile's ability to pay when ordering reimbursement of costs of legal services to the public defender as a condition of probation. The fear of imprisonment for debt is unfounded. Establishment of *inability* to pay prior to revocation is sufficient protection against imprisonment as provided in Article 1, § 5 of the Wyoming Constitution: "No person shall be imprisoned for debt, except in cases of fraud."

The plain language of the statute and the broad jurisdictional provisions dictate that this court refrain from creating a "requirement" of inquiry into ability to pay not in the statute. If such requirement is necessary, the legislature should provide for it, not this court. The broad jurisdictional provisions indicate a legislative intent that we should afford district and juvenile courts more discretion in juvenile matters. The majority's creation of this requirement removes that discretion and thwarts the deference to which courts are entitled in juvenile proceedings.